43 P.3d 4 (2002)
146 Wash.2d 1
STATE of Washington, DEPARTMENT OF ECOLOGY, Appellant,
v.
CAMPBELL & GWINN, L.L.C., a Washington Limited Liability Company; and E.A. White and Beverly White, husband and wife, Respondents.
No. 70279-9.
Supreme Court of Washington, En Banc.
Argued October 16, 2001.
Decided March 28, 2002.
*6 Christine Gregoire, Attorney General, Brian Faller, Asst., Olympia, for Appellant.
Flower & Andreotti, Patrick Michael Andreotti, Charles Camillus Flower, Yakima; Bullivant, Houser & Bailey, Jerret E. Sale, Deborah Lynn Carstens, Seattle, for Respondent.
Christine Gregoire, Attorney General, Jay J. Manning, Asst., Jennifer Tanya Barnett, Asst., Mary E. McCrea, Asst., Olympia, Amicus Curiae on Behalf of Center for Environmental Law.
Don Le Roy Anderson, Okanogan, Amicus Curiae on Behalf of Okanogan County.
Frederick Alan Johnson, Wahkiakum County Prosecutor, Cathlamet, Amicus Curiae on Behalf of Wahkiakum County.
Kristopher Ian Tefft, Olympia, Amicus Curiae on Behalf of Building Industry Asso. of WA.
Larry Dean Stout, Olympia, Amicus Curiae on Behalf of Washington Association of Realtors.
Greg Overstreet, Olympia, Amicus Curiae on Behalf of Washington Ground Water Assoc.
*5 MADSEN, J.
RCW 90.44.050 provides an exemption from groundwater permit requirements for withdrawal of groundwater for domestic uses of 5,000 gallons or less per day. The Department of Ecology challenges the trial court's determination that the exemption applies where a developer of a residential subdivision proposes multiple wells that will individually serve each lot in the development. Each well is proposed to withdraw less than 5,000 gallons per day, but together the wells will withdraw more than 5,000 gallons per day. Because the statute limits the exemption to one 5,000 gallons per day withdrawal whether the water will be used for single or group domestic uses, and because the exemption is from permit requirements which otherwise apply prior to construction of wells or other works to withdraw water, we conclude that the exemption does not apply to permit 5,000 gallons per day to be withdrawn for domestic uses on each lot in respondents' 20-lot development. Accordingly, we reverse the trial court's grant of summary judgment in favor of the respondents.

Facts
In March 1999, respondent Campbell & Gwinn (C & G), a limited liability company, executed a real estate contract with respondents E.A. and Beverly White (the Whites) for the purchase of 20 vacant lots known as the Rambling Brooks Estates. The contract is based on the premise that the lots will be developed or sold by March 2002, at which time the total purchase price is due.
Each lot is subject to a single set of protective rules and covenants. The lots are on a dead-end road that provides the only access, and a sign saying "Rambling Brooks Estates" is at the entrance to the development.
The property lies in the Yakima River Basin, in Yakima County. It has Ahtanum *7 Creek irrigation water rights, but a flood several years ago destroyed off-site diversion facilities. Also, in 1954, a previous owner of the land obtained a permit to appropriate groundwaters to supplement the Ahtanum Creek irrigation rights. That permit was cancelled when the owner failed to file a notice of completion of construction of a well. Although the permit was canceled, the well was used for irrigation for many years while the land was farmed.
Mr. Campbell, a co-owner of C & G, states that a few days after C & G executed the purchase contract with the Whites, he went to Ecology's Central Regional Office in Yakima and spoke with an Ecology employee who advised Campbell that the property had Ahtanum Creek irrigation rights, but that because of the well permit cancellation, water could not be withdrawn from the existing well. Campbell states that the employee also told him that domestic water could be provided without a permit through the use of one well for each one or two parcels. C & G investigated costs, and decided to provide domestic and irrigation water to the lots by constructing individual wells on each lot. Mr. Campbell has stated, though, that he would prefer to use fewer wells if he could do so without a permit.
On April 1, 1999, C & G executed an agreement to sell one of the lots to a contractor. C & G also began work on two "spec" (speculation) houses, and entered into an agreement with a well drilling company, which drilled wells on the "spec" house lots and on the parcel being sold to the contractor. By the first week in August, C & G had entered into an agreement to construct a house on and sell a fourth parcel, and had substantially completed work on the two "spec" houses. The contractor was also nearing construction on the residence he was building.
In the meantime, early in April 1999, an Ecology employee in Yakima charged with enforcing well construction regulations received the notice forms of C & G's intent to drill 20 individual wells. He believed, after reviewing the notices, that they were in violation of a 1997 attorney general opinion that concluded that the permit exemption for groundwater withdrawals for domestic uses of 5,000 gallons per day (gpd) or less does not apply to a group of wells constructed as part of a single development if withdrawal from the wells would exceed 5000 gpd.
In August, Ecology employees relayed concerns to C & G about the applicability of the exemption,[1] and on August 25, 1999, C & G and its attorney and Ecology representatives and an assistant attorney general met to address the problem. Ecology maintained that the 20 lots which C & G owned or was purchasing was a single project for which only one exempt withdrawal was available under RCW 90.44.050, and that any withdrawal in excess of 5,000 gpd for the project would be subject to the permitting and certification requirements of chapter 90.44 RCW. C & G and the Whites disagreed. C & G, the Whites, and Ecology reached a settlement agreement that C & G would diligently and vigorously pursue water rights or water services for four lots then under contract for sale or sold. If C & G were unsuccessful in this attempt, Ecology agreed that it would not take enforcement action against those four lots. As to the remaining undeveloped 16 lots, the parties agreed to submit the exemption issue in a declaratory judgment action in Yakima County Superior Court.
Meanwhile, as the parties note, on August 12,1999, Ecology entered a "Memorandum of Agreement" with the Yakama Nation and the United States Bureau of Reclamation, under which Ecology agreed to impose a five-year moratorium on the issuance of any groundwater permits in the Yakima River Basin. Clerk's Papers (CP) at 672. Ecology has not, in fact, issued any new groundwater permits in the Yakima River Basin since 1993.
*8 On October 29, 1999, Ecology filed this action against C & G and the Whites, seeking declaratory and injunctive relief. Ecology asked the court to declare that the 16 lots may not cumulatively withdraw in excess of 5,000 gpd without first obtaining a permit or other formal authorization, and to enjoin C & G from any further well drilling on the lots.
The parties filed cross-motions for summary judgment. On September 26, 2000, the trial court granted C & G's and the Whites' motion for summary judgment. The court explained in oral comments and stated in its summary judgment order that the exemption is determined with reference to the person making the withdrawal and beneficially using the groundwater. The court ruled that "[w]ithdrawals from multiple wells within a subdivision, if each withdrawal is less than 5,000 gallons per day, are multiple withdrawals, not a single withdrawal. Each 5,000 gallon per day withdrawal is exempt from the permit requirement of RCW 90.44.050." CP at 10 (summary judgment order). The trial court alternatively ruled that Ecology is equitably estopped from requiring that C & G and the Whites comply with the permit process for any individual withdrawals in the development drawing less than 5,000 gpd.
Ecology appealed, seeking direct review of the appeal by this court, which was granted. Two joint amici curiae briefs have been filed by (1) the Center for Law and Policy and the Washington Environmental Council and (2) Okanogan County, Wahkiakum County, the Building Industry Association of Washington, the Washington Association of Realtors, and the Washington Ground Water Association.

Analysis

RCW 90.44.050's exemption from groundwater permit requirements
Chapter 90.44 RCW, the groundwater code, is supplemental to the surface water code, chapter 90.03 RCW, and was enacted in 1945 to extend surface water statutes to the appropriation and beneficial use of groundwater. RCW 90.44.020. Both the surface water code and the ground water code are premised on the doctrine of prior appropriation, which applies when an applicant seeks to obtain a water right in this state. RCW 90.03.010; Postema v. Pollution Control Hearings Bd., 142 Wash.2d 68, 79, 11 P.3d 726 (2000); Neubert v. Yakima-Tieton Irrigation Dist., 117 Wash.2d 232, 240-41, 814 P.2d 199 (1991). Under the prior appropriation doctrine, a water right may be acquired where available public water is appropriated for beneficial use, subject to existing rights. RCW 90.03.010. The same is true of groundwater. "Subject to existing rights, all natural ground waters of the state ... are hereby declared to be public ground waters and to belong to the public and to be subject to appropriation for beneficial use under the terms of this chapter and not otherwise." RCW 90.44.040; see Hillis v. Dep't of Ecology, 131 Wash.2d 373, 383, 932 P.2d 139 (1997). RCW 90.44.060 provides that groundwater applications shall be made in the same way as provided in the surface water code in RCW 90.03.250-.340. Thus, before a groundwater permit may be issued to a private party seeking to appropriate groundwater, Ecology must investigate and affirmatively find (1) that water is available, (2) for a beneficial use, and that (3) an appropriation will not impair existing rights or (4) be detrimental to the public welfare. RCW 90.03.290.
An exemption to the groundwater permitting requirement exists, however, in RCW 90.44.050. RCW 90.44.050 states:
[N]o withdrawal of public ground waters of the state shall be begun, nor shall any well or other works for such withdrawal be constructed, unless an application to appropriate such waters has been made to the department and a permit has been granted by it as herein provided: EXCEPT, HOWEVER, That any withdrawal of public ground waters for stockwatering purposes, or for the watering of a lawn or of a noncommercial garden not exceeding one-half acre in area, or for single or group domestic uses in an amount not exceeding five thousand gallons a day, or for an industrial purpose in an amount not exceeding five thousand gallons a day, is and shall be exempt from the provisions of this section, but, to the extent that it is regularly used beneficially, shall be entitled *9 to a right equal to that established by a permit issued under the provisions of this chapter: PROVIDED, HOWEVER, That the department from time to time may require the person or agency making any such small withdrawal to furnish information as to the means for and the quantity of that withdrawal: PROVIDED, FURTHER, That at the option of the party making withdrawals of ground waters of the state not exceeding five thousand gallons per day, applications under this section or declarations under RCW 90.44.090 may be filed and permits and certificates obtained in the same manner and under the same requirements as is in this chapter provided in the case of withdrawals in excess of five thousand gallons a day.
While the exemption in RCW 90.44.050 allows appropriation of groundwater and acquisition of a groundwater right without going through the permit or certification procedures of chapter 90.44 RCW, once the appropriator perfects the right by actual application of the water to beneficial use, the right is otherwise treated in the same way as other perfected water rights. RCW 90.44.050. Thus, it is subject to the basic principle of water rights acquired by prior appropriation that the first in time is the first in right. "`[T]he first appropriator is entitled to the quantity of water appropriated by him, to the exclusion of subsequent claimants....'" Postema, 142 Wash.2d at 79, 11 P.3d 726 (quoting Longmire v. Smith, 26 Wash. 439, 447, 67 P. 246 (1901)); see RCW 90.03.010 (codifying first in time, first in right principle).
The dispute in this case involves the scope of the exemption for "any withdrawal of public ground waters ... for single or group domestic uses in an amount not exceeding five thousand gallons a day." RCW 90.44.050.
The meaning of a statute is a question of law reviewed de novo. State v. Breazeale, 144 Wash.2d 829, 837, 31 P.3d 1155 (2001); State v. J.M., 144 Wash.2d 472, 480, 28 P.3d 720 (2001). The court's fundamental objective is to ascertain and carry out the Legislature's intent, and if the statute's meaning is plain on its face, then the court must give effect to that plain meaning as an expression of legislative intent. J.M., 144 Wash.2d at 480, 28 P.3d 720. However, descriptions of the "plain meaning" rule have not been uniform in this court's cases. In some cases, the court has said that "[i]n a[] unambiguous statute, a word is given its plain and obvious meaning." Addleman v. Bd. of Prison Terms & Paroles, 107 Wash.2d 503, 509, 730 P.2d 1327 (1986); see Young v. Estate of Snell, 134 Wash.2d 267, 279, 948 P.2d 1291 (1997) (the meaning of a statute must be derived from the wording of the statute itself where the statutory language is plain and unambiguous); Waggoner v. Ace Hardware Corp., 134 Wash.2d 748, 752, 953 P.2d 88 (1998) (same); State ex rel. Royal v. Bd. of Yakima County Comm'rs, 123 Wash.2d 451, 458, 869 P.2d 56 (1994) (same). If the meaning of the language is ambiguous or unclear, this line of cases directs that examining the statute as a whole, or a statutory scheme as a whole, is then appropriate as part of the inquiry into what the Legislature intended. See, e.g., Addleman, 107 Wash.2d at 509, 730 P.2d 1327; Sebastian v. Dep't of Labor & Indus., 142 Wash.2d 280, 285, 12 P.3d 594 (2000). Thus, some of our cases indicate that consideration of a statutory scheme as a whole, or related statutes, is part of the inquiry into legislative intent only if a court determines that the plain meaning cannot be derived from the statutory provision at issue and ambiguity necessitates further inquiry.
Other cases indicate, however, that under the "plain meaning" rule, examination of the statute in which the provision at issue is found, as well as related statutes or other provisions of the same act in which the provision is found, is appropriate as part of the determination whether a plain meaning can be ascertained. In Estate of Lyons v. Sorenson, 83 Wash.2d 105, 108, 515 P.2d 1293 (1973), for example, the court said that legislative intent is to be determined from what the Legislature said, if possible. The court then determined legislative intent from the "plain and unambiguous" language of a statute "in the context of the entire act" in which it appeared. Id.; see also C.J.C. v. Corp. of the Catholic Bishop of Yakima, 138 Wash.2d *10 699, 708-09, 985 P.2d 262 (1999) (where statutory language is clear and unambiguous, its meaning is derived from its language alone; court construes an act as a whole, giving effect to all the language used, with related statutory provisions interpreted in relation to one another); ITT Rayonier, Inc. v. Dalman, 122 Wash.2d 801, 807, 863 P.2d 64 (1993) (a term in a regulation should not be read in isolation but rather within the context of the regulatory and statutory scheme as a whole; statutory provisions must be read in their entirety and construed together, not by piecemeal).
As has been noted:
In the past, the plain meaning rule rested on theories of language and meaning, now discredited, which held that words have inherent or fixed meanings. These theories are unnecessary to the plain meaning rule, however, if the rule is interpreted to direct a court to construe and apply words according to the meaning that they are ordinarily given, taking into account the statutory context, basic rules of grammar, and any special usages stated by the legislature on the face of the statute. So defined, the plain meaning rule requires courts to consider legislative purposes or policies appearing on the face of the statute as part of the statute's context. In addition, background facts of which judicial notice can be taken are properly considered as part of the statute's context because presumably the legislature also was familiar with them when it passed the statute. Reference to a statute's context to determine its plain meaning also includes examining closely related statutes, because legislators enact legislation in light of existing statutes.
2A Norman J. Singer, Statutes and Statutory Construction § 48A:16, at 809-10 (6th ed. 2000) (extracts from R. Randall Kelso & C. Kevin Kelso, Appeals in Federal Courts by Prosecuting Entities Other than the United States: The Plain Meaning Rule Revisited, 33 Hastings L.J. 187 (1981)).
Under this second approach, the plain meaning is still derived from what the Legislature has said in its enactments, but that meaning is discerned from all that the Legislature has said in the statute and related statutes which disclose legislative intent about the provision in question. Upon reflection, we conclude that this formulation of the plain meaning rule provides the better approach because it is more likely to carry out legislative intent. Of course, if, after this inquiry, the statute remains susceptible to more than one reasonable meaning, the statute is ambiguous and it is appropriate to resort to aids to construction, including legislative history. Cockle v. Dep't of Labor & Indus., 142 Wash.2d 801, 808, 16 P.3d 583 (2001); Timberline Air Serv., Inc. v. Bell Helicopter-Textron, Inc., 125 Wash.2d 305, 312, 884 P.2d 920 (1994).
Here, the plain meaning of the domestic uses exemption is apparent from the language in RCW 90.44.050 and related statutes. RCW 90.44.050 plainly says that the exemption applies provided 5,000 gpd or less is used for domestic purposes. This is true, the statute provides, whether the use is to be a single use or group uses. That is, whether or not the use is a single use, by a single home, or a group use, by several homes or a multiunit residence, the exemption remains at one 5,000 gpd limit, according to the plain language of the statute. The developer of a subdivision is, necessarily, planning for adequate water for group uses, rather than a single use, and accordingly is entitled to only one 5,000 gpd exemption for the project.
Secondly, where a permit is required, it is required before any wells are dug. Under the groundwater code, each applicant to withdraw groundwater must provide specified information, including the location of the proposed well or wells or other works for withdrawal of water, the amount of water proposed to be withdrawn, and the depth and type of construction proposed for the well or wells or other works. RCW 90.44.060. RCW 90.03.250 provides for the application procedure for surface water and, by virtue of RCW 90.44.060, for groundwater as well. RCW 90.03.250 states that any person may make application for a permit to make an appropriation of water for beneficial use,
and shall not use or divert such waters until he has received a permit from the department as in this chapter provided.

*11 The construction of any ditch, canal or works, or performing any work in connection with said construction or appropriation, or the use of any waters, shall not be an appropriation of such water nor an act for the purpose of appropriating water unless a permit to make said appropriation has first been granted by the department.
RCW 90.44.050 itself begins with the language "no withdrawal of public ground waters of the state shall be begun, nor shall any well or other works for such withdrawal be constructed, unless" a permit is issued, except as provided in the exemption. (Emphasis added.) Thus, RCW 90.44.050 plainly contemplates, as do related statutes, that a permit is required before any construction occurs and before any withdrawal of water is made. Withdrawal of water, alone, is not the activity that necessitates a permit. A permit is required earlier in the process, before any well is dug or other works constructed for withdrawal of groundwater.
Thus, two concepts, construction of works, or digging of wells in order to withdraw water, and the withdrawal of water and putting it to beneficial use are linked in the permitting process. Neither can occur absent a permit. The same two concepts must be linked for purposes of the exemption from the permitting process because that is precisely what the exemption isan exemption excusing the applicant from permit requirements. The one seeking an exemption from permit requirements is necessarily the one planning the construction of wells or other works necessary for withdrawal of water and is the one who would otherwise have to have a permit before any construction commences or wells are dug. Thus, under RCW 90.44.050, and related statutes, qualification for the exemption does not depend, as respondents claim, solely on who ultimately withdraws the water and puts it to beneficial use.[2] It also concerns the person planning the wells or other works, before any water is ever withdrawn. Moreover, we note that if the developer in this case dug one well to provide water for the domestic uses for the entire development, there is no question that more than 5,000 gpd would be withdrawn and a permit would be required. Insofar as beneficial use is concerned, however, the water would be put to the same purpose and actually beneficially used by the same homeowners who would withdraw from individual wells.
Because (1) the proposed use is group domestic uses, and (2) the exemption to the permit must be determined with regard to the same conditions necessitating compliance with permitting requirements if the exemption does not apply, the exemption does not apply here to allow a withdrawal for each lot in the residential subdivision under separate, individual 5,000 gpd exemptions.[3] In this case it is the developer, not the homeowner, who is seeking the exemption in order to drill wells on the subdivision's lots and provide for group domestic uses in excess of 5,000 gpd. The developer may not claim multiple exemptions for the homeowners.[4]
*12 C & G contends, though, that the plain meaning of RCW 90.44.050 flows from the words "any withdrawal" in the statute. C & G argues that the court should determine the meaning of the words "any withdrawal" from standard dictionary definitions, and that "any" means "every" and "all." Webster's Third New International Dictionary 97 (1986); see State v. Smith, 117 Wash.2d 263, 271, 814 P.2d 652 (1991); State ex rel. Evans v. Bhd. of Friends, 41 Wash.2d 133, 145, 247 P.2d 787 (1952). "Withdrawal," C & G urges, means "to remove or draw out from a place or position." Webster's at 2626 (defining "withdraw"). Thus, C & G reasons, the statute plainly provides that "every or all removals" of groundwater for domestic uses of less than 5,000 gpd[5] is exempt from permitting requirements.
However, as Ecology urges, C & G's reading of "any withdrawal" in the exemption would necessarily mean that each well is a separate withdrawal because every and all removals of groundwater would fall within "any withdrawal." But, as Ecology points out, the groundwater code clearly contemplates that one withdrawal may be made from more than one well. RCW 90.44.060 refers to "each application to withdraw public ground water by means of a well or wells" shall set forth certain information. (Emphasis added.) RCW 90.44.100(1), allowing for amendment of groundwater permits or certificates, states that "the holder of a valid right to withdraw public ground waters may ... construct wells or other means of withdrawal at a new location" if the change is approved. (Emphasis added.) The same statute says that a permit or certificate may be amended to allow construction of "replacement or a new additional well or wells." RCW 90.44.100(2) (emphasis added). RCW 90.44.080(1), concerning the showing required to obtain a certificated water right, requires the permittee to show "the location of each well or other means of withdrawal constructed under the permit." (Emphasis added.) Thus, under a permit or water right certificate, one can, under appropriate circumstances, remove water using two or more wells.
The term "withdrawal" is, as Ecology urges, a term of art in water law, although Ecology does not go so far as to define it. In general, when one appropriates water one does so by means of diversion of surface water or by withdrawal of groundwater. The words "diversion" and "withdrawal" both relate to the actual physical acquisition of water to put to beneficial use, and both also relate to the type of right a water right holder has, i.e., diversionary and withdrawal rights. Neither term, in and of itself, defines the scope of the right, and the word "withdrawal" and the words "any withdrawal" do not establish the plain meaning of the exemption in RCW 90.44.050.
Other statutes in the surface and groundwater codes support our understanding of the plain meaning of RCW 90.44.050. As Ecology points out, the surface and groundwater codes generally require protection of existing rights and water resources. See RCW 90.03.290; RCW 90.44.030, .070; RCW 90.54.020. Of course, where the exemption in RCW 90.44.050 applies, Ecology does not engage in the usual review of a permit application under RCW 90.03.290, including review addressing impairment of existing rights and public interest review. Nevertheless, the Legislature's limits on the exemption, particularly the 5,000 gpd limit on the group uses exemption, establishes that the Legislature did not intend unlimited use of the exemption for domestic uses, and did not intend that water appropriation for such uses be wholly unregulated. The balance which the Legislature struck in RCW 90.44.050 allows small exempt withdrawals for domestic uses, but does not contemplate use of the *13 exemption as a device to circumvent statutory review of permit applications generally.
The parties here dispute the potential impacts if RCW 90.44.050 is read to allow the exemption to apply to each individual well in a development such as Rambling Brooks Estates.[6] The question is more basic, i.e., whether the Legislature even contemplated the possibility that developments of the size in this case, or even larger, would be entitled to exempt withdrawals of 5,000 gpd for each of their lots. Given the limitation on single and group uses, and the overall goal of regulation to assure protection of existing rights and the public interest, it is clear that the Legislature did not intend that possibility when this statute was enacted.[7]
Respondents urge, however, that there are enforcement mechanisms in place to assure that existing rights and the public interest can be protected even if the exemption is applied as they request.[8] Initially, the existence of enforcement statutes does not alter the plain meaning of RCW 90.44.050. Moreover, after-the-fact remedies will not serve legislative purposes as effectively as review before appropriation occurs. By the time they are invoked, particularly given that Ecology's resources are already spread too thin, see Hillis v. Dep't of Ecology, 131 Wash.2d 373, 932 P.2d 139 (1997), damage will already have been done. While the Legislature has obviously discerned that this is an acceptable risk for small exempt uses, the Legislature's limit on single and group domestic uses tells us that it is an impermissible result beyond the plain terms of the statute.[9]
*14 Finally, on this issue, it seems apparent that developers seek to use the exemption in an attempt to bypass the permit system because obtaining new permits to appropriate water within a reasonable time has become virtually impossible. The backlog of unprocessed permits is due in part, it appears, to inadequate funding for Ecology to carry out its statutory duties. The problems faced by developers and others seeking to appropriate water could be ameliorated to a degree if the Legislature would provide adequate funding for studies, resources, and personnel necessary to carry out the water resource laws and regulations.

Rule making
C & G argues that Ecology failed to engage in required rule making when it "changed" its interpretation of the exempt well provision. C & G reasons that Ecology asserts "developer intent" (that the intent of the developer determines whether the exemption applies) as a limitation on the exemption. This limitation, C & G reasons, is of general applicability and clearly establishes or alters qualifications for the enjoyment of benefits or privileges conferred by law, and thus is a rule subject to the Administrative Procedure Act (chapter 34.05 RCW) rule making requirements. See generally Hillis, 131 Wash.2d at 398-400, 932 P.2d 139.
As a matter of the plain meaning of the statute, the exemption in RCW 90.44.050 does not apply where a developer proposes to use multiple wells collectively withdrawing over 5,000 gpd to serve a subdivision. Accordingly, the issue is not one of agency policy subject to rule making. "Administrative rules or regulations cannot amend or change legislative enactments." Dep't of Ecology v. Theodoratus, 135 Wash.2d 582, 600, 957 P.2d 1241 (1998) (citing Pannell v. Thompson, 91 Wash.2d 591, 601, 589 P.2d 1235 (1979)).

Equitable Estoppel
The trial court held on alternate grounds that RCW 90.44.030's exemption must be applied in this case because Ecology is equitably estopped by its actions from requiring a permit to withdraw groundwater. Respondents have claimed that (1) Ecology did not appeal a 1986 county short plat determination which indicated that the lots in C & G's development would be served by individual wells; (2) an Ecology employee told Mr. Campbell that C & G would be able to place a well on every one to two lots without a permit provided the 5,000 gpd limit was met; and (3) Ecology did not take enforcement action until four months after it received from C & G notices to construct exempt water wells on the lots in Rambling Brooks Estates.
Equitable estoppel may apply where there has been an admission, statement or act which has been justifiably relied upon to the detriment of another party. Lybbert v. Grant County, 141 Wash.2d 29, 35, 1 P.3d 1124 (2000); Beggs v. City of Pasco, 93 Wash.2d 682, 689, 611 P.2d 1252 (1980). Establishment of equitable estoppel requires proof of (1) an admission, act or statement inconsistent with a later claim; (2) another party's reasonable reliance on the admission, act or statement; and (3) injury to the other party which would result if the first party is allowed to contradict or repudiate the earlier admission, act or statement. Theodoratus, 135 Wash.2d at 599, 957 P.2d 1241. Equitable estoppel against the government is not favored. Id. Accordingly, when the doctrine is asserted against the government, it must be necessary to prevent a manifest injustice and applying estoppel must not impair the exercise of government functions. Id. Proof of the elements of estoppel must be by clear, cogent and convincing evidence. Id.
Ecology maintains that the doctrine does not apply because the issue of statutory construction involved here is a matter of law, rather than an issue of fact. See Theodoratus, 135 Wash.2d at 599-600, 957 P.2d 1241.[10] We agree. Although the Whites urge that the issue is whether the withdrawal or withdrawals fall within the exemption, and therefore is a question of fact, the issue is the *15 meaning and scope of the exemption, not whether a particular set of circumstances brings a case within that scope.[11]
As in Theodoratus, the doctrine of equitable estoppel does not apply in this case because the meaning of a statutory provision is at issue.

Conclusion
Once again this court must decide an issue involving appropriation of this state's public waters, at a time when existing applications to appropriate water are severely backlogged. It is understandable that the developer in this case wants to use the domestic uses exemption in RCW 90.44.050 as a way to obtain water. However, the statute's plain language directs that the exemption is not intended for use by a developer to provide water for group uses by multiple homes each withdrawing up to 5,000 gpd. Moreover, whether the exemption applies must be determined with regard to who is planning the construction of wells or other works to withdraw water, because the permit process, and thus necessarily an exemption from that process, must be determined prior to construction of wells or other works. The developer, in this case, seeks the exemption and, under RCW 90.44.050 and related statutes, is not entitled to use the exemption to withdraw more than 5,000 gpd, whether for single or group domestic uses.
The summary judgment in favor of respondents is reversed, and this case is remanded for entry of summary judgment in favor of the Department of Ecology.
ALEXANDER, C.J., and SMITH, IRELAND, and CHAMBERS, JJ., concur.
OWENS, J., dissents by separate opinion.
SANDERS, J., concurs in dissent by separate opinion.
SANDERS, J. (concurring in dissent).
I agree with the majority that the "plain language" of RCW 90.44.050 should control the disposition of this case, and I agree with the dissent that it does.
This statute plainly requires a permit prior to the construction of a well and withdrawal of public ground waters
EXCEPT, HOWEVER, That any withdrawal of public ground waters ... for single or group domestic uses in an amount not exceeding five thousand gallons a day ... is and shall be exempt from the provisions of this section....
RCW 90.44.050.
From a facial reading of the text it seems apparent that drilling a well to withdraw less than five thousand gallons per day for domestic uses, whether single or group domestic uses, is categorically exempt.
Notwithstanding, the majority finds it necessary to turn this simple exemption statute on its head through pages of extralegal contortions to conclude:
The developer of a subdivision is, necessarily, planning for adequate water for group uses, rather than a single use, and accordingly is entitled to only one 5,000 gpd exemption for the project. *16 Majority at 10. For this statement to make sense the majority must be assuming the statute limits exempt wells to one per customer. But the statute doesn't say that.
Not that it matters, but by the majority's logic a developer could drill only one exempt well to service 16 lots whereas after sale of these lots to individual purchasers, each of the 16 could drill their own wells. What reason could the legislature have in mind to make such a distinction? I can think of none. Nor can I find such a distinction in the clear language at issue.
The majority's rationale for a distinction between single homeowners and developers (who usually make single home acquisition possible) is buried in footnote number 4 on page 11:
[I]t does make a difference whether the exemption from the permitting requirements is sought by an individual homeowner or a developer. Aside from the statutory distinctions (the exemption is from permitting, which otherwise applies to the party who seeks to construct the well, and expressly applies prior to commencement of any construction of the wellthus applying to the developer), use of the exemption by developers will predictably and greatly expand unpermitted water use in this state. Individual, single family residential use of the exemption (or group uses not exceeding 5,000 gpd in total) is simply not comparable to what can occur if the exemption is rewritten to allow for multiple wells in large developments.
In summary, the majority prefers fewer exempt wells to more exempt wells; therefore the majority rewrites the statute to disallow construction of exempt wells by developers.
But if it is true "developers will predictably and greatly expand unpermitted water use in this state," it is only so because developers may find it expedient to do so under the exception which the legislature has created which allows exactly that. Apparently the majority would prefer to eliminate or narrow statutory exemptions so as to prevent citizens (who happen to be engaged in development of land) from withdrawing ground water for beneficial domestic purposesbecause that will allow people to develop their land. The inevitable result of the majority's public policy (which supplants the legislature's public policy) is to stifle economically exemption is meant to allow, and these are the only conditions for its applicability.
RCW 90.44.050 clearly creates an exemption from the permit requirement for the taking of groundwater for domestic use and the exemption is clearly limited to 5,000 gpd. But the difficulty of this case comes from the vagueness inherent in this statute. It does not explain when one 5,000 gpd exemption is available, instead of 2 or 16. There are two possibilities in the statute: either 5,000 gpd may be taken for every "withdrawal" or for every "single or group domestic use." The majority deals with neither satisfactorily.
The majority observes that one withdrawal may be made by multiple wells. Majority at 12. Obviously one person can drink from two straws. But multiple wells can make multiple withdrawals too. No rhyme or reason is apparent why these wells make just one. The majority observes that multiple wells can make 1 withdrawal only to rebut the notion that merely drilling 16 wells is by definition 16 withdrawals. Granted 16 wells do not necessarily make 16 withdrawals, the majority does not explain why they in fact do not here.
But the majority does not say that Campbell & Gwinn is limited to one 5,000 gpd exemption on account of its 16 wells being 1 withdrawal. Instead, the majority concludes that Campbell & Gwinn's proposed wells are one group domestic "use" entitled to one exemption. Majority at 10. I agree that we should focus our attention on the intended use of the water, in keeping with our historical adherence to "beneficial use" as the fundamental measure of water rights. Dep't of *17 Ecology v. Acquavella, 131 Wash.2d 746, 755, 935 P.2d 595 (1997) (citing 1 WELLS A. HUTCHINS, WATER RIGHTS LAWS IN THE NINETEEN WESTERN STATES 9 (1971); Ickes v. Fox, 300 U.S. 82, 94, 57 S.Ct. 412, 81 L.Ed. 525 (1937); Neubert v. Yakima-Tieton Irrigation Dist., 117 Wash.2d 232, 237, 814 P.2d 199 (1991)). If each use, single or group, is entitled to one exemption, the issue becomes how to tell the two apart.
"Group domestic use" is not defined by the statute; and even though the majority relies on the term, it is not defined by the majority either. The majority says that "several homes" or a "multiunit residence," majority at 10, may be a group use. The majority reasons that an exempt withdrawal is limited to 5,000 gpd no matter whether it is for single or group uses. The trouble comes in assuming that what is proposed is 1 group use, not 16 single uses. I take it for granted that some nexus must be found between two well users to call their uses a "group use" legitimately. The problem of defining "group domestic use" is a matter of indicating when two uses become so connected that they become "group use," and cease to be "single uses" qualifying for two exemptions. Obviously two homeowners both entitled to drill an exempt well could drill one between them and agree to make a group use. In any event, simply declaring that this case involves a group use does not convince me that it is so.
The water to be taken in this case would be used by homeowners for their domestic needs. At best the record is vague on the nexus between their uses. A Department of Ecology employee states that the subterranean "zones" from which the water would be drawn are "hydraulically connected." Clerk's Papers (CP) at 903-04. It is not clear whether he is referring to the well works or the aquifers. The neighborhood covenants contain references to a common "irrigation" plan. CP at 742. However, covenant 15 says that a lot may instead use its domestic well for irrigation, suggesting that the irrigation plan is separate from the wells. Id. Otherwise, the only connection between the intended water users in this the majority notes, is the presence of a sign at the entrance to the development. I cannot see how, with so little discussion of the evidence, the majority reaches its conclusion that this case deals with a group use, instead of single uses. The majority does not explain how to tell the difference.
The majority does not talk adequately about group use because of its reliance on the fact that Campbell & Gwinn will construct the wells. Because a permit is required both to construct a well and to withdraw water, the majority concludes at page 11 that construction and withdrawal are linked for purposes of a permit exemption. I do not understand its logic when it says that well construction and water withdrawal are "linked" for purposes of the exemption. The majority appears to confuse the tasks which are exempted with the conditions making the exemption available. The conditions triggering this exemption are the purpose of the appropriation and the amount appropriated. The only sense I can make of the majority's argument is that it means that the availability of the exemption depends on who constructs the well. I can see how this question could be relevant, but only insofar as it relates to the conditions announced by the legislatureproper use in a proper amount. But since the majority seems to say that the fact that Campbell & Gwinn will construct the wells is an independent reason why these wells are not exempt, the majority seems to attach a condition to the domestic well exemption that is not expressed in the statute.
Even stranger than the majority's position is that espoused by Ecology at oral argument, that even if Campbell & Gwinn were to sell the lots to individuals who built their own homes and drilled their own wells, the wells would still not fall under the domestic well exemption. According to Ecology, "the legislature plainly chose not to allow each household in a group of households to have a separate 5,000 gpd exemption." Opening Br. of Appellant at 24. As far as I can tell, Ecology believes that a developer *18 who purchases a tract somehow taints it, fixing the whole tract's right to exempt well use at 5,000 gpd. The majority implies that this position is not correct, since it relies, at page 11, on the fact that the developer sought the exemption in this case, not the homeowner. But Ecology's angle is not so different from the majority's: the real bone of contention is that we are talking about a developer. But the domestic well exemption simply does not depend on who drills the well. It depends on who uses the water, and how much gets used. Because of my difference of opinion with the majority, I would find 16 single domestic uses here and affirm the trial court.
I have only one technical criticism of the majority. The majority's method of statutory construction in this case is to look at related statutes governing the taking of groundwater. That's fine. However, the majority should consider all the statutory provisions accompanying RCW 90.44.050, not merely a select few. Even though the majority says that we should construe RCW 90.44.050 in its statutory context, majority at 10, it also says that "the existence of enforcement statutes does not alter the plain meaning of RCW 90.44.050," majority at 13. The majority ignores remedial and regulatory powers given to Ecology to prevent the "unlimited use," majority at 12, that it fears. Even though the exemption is for withdrawals up to 5,000 gpd, under the prior appropriations doctrine it does not follow that each homeowner will in fact be allowed to take that much from Yakima's rambling brooks.
RCW 90.44.050 itself permits Ecology to monitor the method and amount of exempt withdrawals. RCW 90.44.130 permits it to limit subsequent withdrawals to "an amount that will maintain and provide a safe sustaining yield in the amount of the prior appropriation" (emphasis added). RCW 90.44.180 and RCW 90.44.220 permit Ecology to conduct hearings or bring actions in superior court to control excessive withdrawals. These statutes may not be as effective enforcement tools as the power to deny a permit outright, but the court is not here considering the wisest methods for Ecology's allocation of groundwater. We are interpreting the meaning of a statute. If the statutes requiring Ecology to protect existing water rights are relevant in interpreting the "balance" struck in RCW 90.44.050, majority at 12, then surely these remedial statutes are too.
Lastly I note that although the majority says the exemption "plainly" means something different from what I believe it does, for over 50 years Ecology used the same interpretation I use today. In its brief Campbell & Gwinn cites several occasions on which Ecology allowed projects similar to Campbell & Gwinn's to go forward, based on the domestic well exemption. Br. of Resp't-Campbell & Gwinn at 17 n. 2. Even more compelling is the fact that an Ecology employee told Robert Campbell when his firm efficient development, create an artificial scarcity of building lots, and "dry up" affordable housing for lack of available water and/or making it more costly to acquire. Whatever benefits there may be to the majority's public policy, and my imagination is too challenged to conceive of any, it is a matter for the legislature, not our majority, to enact it. And it hasn't.
Accordingly I would affirm the learned trial court: Wells withdrawing less than 5,000 gpd for domestic uses are categorically exempt, because the legislature says they are.
I join the dissent.
OWENS, J. (dissenting).
The decision today tolls the bell for growth and growth management in rural Washington. Until now, growth management plans in rural counties have depended on the availability of the domestic well exemption to promote sensible growth because large water supply installations are often not feasible. The result the majority hopes to achieve preventing developers from using the domestic *19 well exemptionmay (or may not) be environmentally laudable. But it will upset rural development. The majority cannot foresee whether the effect will be for better or worse. In any event, the majority's foray into lawmaking rests on a tortured interpretation of the domestic well exemption. Because I subscribe to the old-fashioned notion that statutes mean what they say, I dissent.
The heart of the majority's reasoning is that Campbell & Gwinn's proposal to use individual wells to supply water to a development is an abuse of the exemption. What cannot be done with 1 well, the majority tells us, cannot be done with 16. The flaw in the majority's reasoning is that 16 homeowners could do just what Campbell & Gwinn proposes. The majority's construction of RCW 90.44.050 forgets the point of the domestic well exemption. Each well would serve one family's domestic needs, and draw less than 5,000 gallons per day (gpd). This use in this amount is exactly what the domestic well bought the lots that individual wells falling under the domestic well exemption could be used to water this development in lieu of obtaining a water permit. Apparently, Ecology's late epiphany about what RCW 90.44.050 "plainly" means had not yet circulated to the Yakima office. The result is that the newly adopted Ecology interpretation "ignore[s] the express language of the statute, the statute's legislative history, and [Ecology's] own prior, consistent interpretation and application of the statute." Br. of Resp't-Campbell & Gwinn at 50.
I respectfully dissent.
BRIDGE and JOHNSON, JJ., concur.
NOTES
[1] On August 6, 1999, one Ecology employee issued an oral "cease and desist" order to Campbell & Gwinn (C & G) and to C & G's well-driller, prohibiting any further well construction. Three days later, another Ecology employee advised C & G that this oral order was being withdrawn.

The next day, this employee advised C & G's attorney that C & G would proceed at its own risk if it constructed wells, and that Ecology might in the future assert the wells could not be used without permits.
[2] The Whites focus on the language of the statute respecting the uses to which the water may be put. The exemption is provided for "single or group domestic uses in an amount not exceeding five thousand gallons a day." RCW 90.44.050. They note that the statute also provides that to the extent water is "regularly used beneficially" the right is equal to that established by a permit issued under chapter 90.44 RCW. RCW 90.44.050. Here, they say, it is undisputed that the groundwater withdrawal will be made by the homeowners, not the developer, and the homeowners will be the ones putting the water to beneficial use for domestic purposes. This is the reading of the statute accepted by the trial court.
[3] Contrary to the dissenting opinion, there is nothing in this record that supports the dissent's claim that Ecology has, as a matter of agency policy, held the view for 50 years that the exemption allows the multiple wells sought in this case. The record indicates that the issue has arisen recently because developers have sought ways to obtain water in the face of a backlog on permit applications. Nor should Ecology be held to the view of some of its employees. On this record, it simply cannot be fairly said that Ecology has adopted any policy as to application of the exemption to multiple wells in residential developments. Thus, even if one concluded the exemption is ambiguous, there is no agency interpretation of the statute binding the agency.
[4] Also contrary to the dissent's view, it does make a difference whether the exemption from the permitting requirements is sought by an individual homeowner or a developer. Aside from the statutory distinctions (the exemption is from permitting, which otherwise applies to the party who seeks to construct the well, and expressly applies prior to commencement of any construction of the well-thus applying to the developer), use of the exemption by developers will predictably and greatly expand unpermitted water use in this state. Individual, single family residential use of the exemption (or group uses not exceeding 5,000 gpd in total) is simply not comparable to what can occur if the exemption is rewritten to allow for multiple wells in large developments. If the Legislature had intended the exemption to apply to all residential domestic uses, it would have written the exemption that way.
[5] Although C & G says "less than" 5,000 gpd is exempt, the statute actually says in an amount not to exceed 5,000 gpd.
[6] The record indicates that developers are interested in using the exemption in RCW 90.44.050 to provide water for new development. Clerk's Papers (CP) at 838-40 (Ecology staff person declaration describing recent developments which have been built or proposed using multiple wells). It is possible that to date use of the exemption for subdivisions has been discouraged by 1997 Op. Att'y Gen. No. 6.
[7] Despite the drama of the dissent's opening line, the majority opinion does not "toll" any "bells." It has been abundantly clear for some time that growth can be and is affected by the Legislature's enactments respecting water allocation, permitting and management, as well as by funding decisions. One has only to look at Hillis v. Department of Ecology, 131 Wash.2d 373, 932 P.2d 139 (1997), involving the backlog of permit applications, to recognize that the Legislature's action or inaction has enormous impact in this area. The court's recent cases, and recent legislative efforts, show that water management is a huge issue in this state.

There is clearly controversy as to the best way to manage this state's water resources. However, policy decisions are the province of the Legislature, not of this court. The dissent would have this court write water policy by rewriting RCW 90.44.050. The chief problem with the dissent's rewrite of the statute is that the exemption will decimate the general rule, i.e., the permitting requirement. The role of this court is to preserve the general requirement of permitting, as the Legislature obviously intended.
[8] RCW 90.44.050 itself provides that a right acquired under the exemption is to be treated as all other rights, and thus is subject to the prior appropriation doctrine's first in time first in right principle. The same statute authorizes Ecology to require a person making an exempt withdrawal to provide information about the means and quantity of withdrawal. RCW 90.44.130 authorizes Ecology to limit withdrawals by appropriators to maintain a safe sustaining yield from groundwater bodies. RCW 90.44.180 authorizes Ecology on its own motion or by water users petition to conduct hearings and determine whether the water supply in a designated area is adequate for current needs and to order withdrawals decreased. RCW 90.44.220 authorizes Ecology to apply to court for an adjudication of all rights in a particular groundwater body.
[9] Amici Okanogan County, Wahkiakum County, the Building Industry Association of Washington, the Washington Association of Realtors, and the Washington Ground Water Association argue that multiple exempt wells are crucial to rural development where municipal or private water purveyor water is not available and new water rights are extremely difficult to obtain because of the backlog of applications. Amici say that development will be paralyzed in rural areas under Ecology's position. They also urge that Growth Management Act (chapter 36.70A RCW) planning duties will be hindered if the exempt well provision does not apply to multiple wells in a development.

It is no secret that water availability is a crucial issue in this state, and will become even more so as time passes. The policy issues raised by amici should be directed to the Legislature, however, which is in the best position to determine how this increasingly scarce resource should be managed. It is inappropriate for this court to rewrite statutes.
We add, though, that developers may have other avenues of available water, including existing water purveyors, transfer of existing water rights, and, where proper, condemnation.
[10] Equitable estoppel does not apply when the acts of a governmental body are ultra vires and void. State v. Adams, 107 Wash.2d 611, 615, 732 P.2d 149 (1987).
[11] C & G maintains that if the meaning of a statute is uncertain, the doctrine may be applied even where a question of statutory meaning is involved. It relies on Hitchcock v. Washington State Retirement Systems, 39 Wash.App. 67, 72-73, 692 P.2d 834 (1984). Hitchcock does not stand for the proposition, however. There, the court noted the doctrine would not be applied to frustrate the clear purpose of state laws. Id. It observed that while the applicant for retirement benefits in that case was employed, no statute provided that compensation for personal services could not include payments to defray expenses in performing services. After the applicant applied for retirement benefits, a statutory enactment provided that an employee's salary could not be increased by a payment in lieu of a fringe benefit, and further provided that the statute would not apply to any contracts in force on March 27, 1982. The court reasoned that allowing payments in lieu of fringe benefits (an automobile in that case) included in contracts prior to the enactment of the statute to be included within earnable compensation for purposes of retirement calculations would not frustrate the purpose of the law. Hitchcock does not support C & G's claim that equitable estoppel applies here.