IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| OAK HARBOR MAIN STREET ASSOCIATION, a Washington nonprofit corporation,<br><br>          Respondent,<br><br>  v.<br><br>CITY OF OAK HARBOR, a Washington municipal corporation; and NORTHWEST STUDIO, LLC, a Washington limited liability company,<br><br>          Defendants,<br><br>PIONEER WAY HOUSING, LLLP, a Washington limited liability limited partnership,<br><br>          Appellant. | No. 81349-8 -I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

COBURN, J. — Pioneer Way Housing, LLLP (PWH) applied to develop a mixed use housing project (the "Project") in Oak Harbor's Central Business District zone (CBD). Under its plain language, Oak Harbor Municipal Code (OHMC) requires mixed use developments in the CBD. However, when a development's predominate use is residential, it must be located in the CBD's designated subdistricts CBD-1 or CBD-2. Island County Superior Court reversed

Citations and pin cites are based on the Westlaw online version of the cited material.

Oak Harbor City Council's approval of the Project because the Project's predominate use is residential but it is not located in either subdistrict. We affirm.

BACKGROUND

On October 19, 2018, PWH submitted an application to the City of Oak Harbor Development Services Department (Department) to develop the Project. The Project's application requested Site Plan, Boundary Line Adjustment, SEPA, Grading, Landscape Plan, and Transportation Concurrency review and permits.[1] Relevant here is the Site Plan.

PWH described the Project as a:

[A] new, mixed-use multifamily development containing 51-units of housing, approximately 530 square feet of retail space, and 77 off-street parking spaces on a 1.153-acre site at 601 SE Pioneer Way, within Oak Harbor's Central Business District (CBD). The project is designed to preserve the unique history and heritage of Oak Harbor, enhance the mainstreet and pedestrian-oriented character of downtown, and deliver affordable housing close to jobs, transit, daily services, and open space.

The purpose and intent of the CBD is to "preserve and enhance the unique harbor location of the city's heritage with the character of the traditional center of social, culture and retail activity." OHMC 19.20.300. "Mixed use developments, combining retail and visitor-oriented activities on the ground floor with office, retail and residential uses above, are required." OHMC 19.20.300. Specifically, "[s]ubdistricts CBD-1 and CBD-2 are created in order to provide for

_____

[1] "The adjustment of boundary lines may be approved by the director if an application is filed along with the information required by OHMC 21.70.050(1) and (2), and where no new lot is created thereby or where no lot is reduced in size below the minimum square footage and street frontage required by the applicable zoning control and this title." OHMC 21.70.080.

2

flexibility of residential development within specific areas of the central business district." OHMC 19.20.300. Generally, developments in the CBD must comply with the following "principal permitted uses":

> (a) In the CBD district: mixed use sites with multiple street frontages may locate dwelling units on the ground level on any street frontages other than Pioneer Way;

> (b) In subdistricts CBD-1 or CBD-2: dwelling units may be the primary use of the site.

OHMC 19.20.305(45).

The intent of the Site Plan review process is to "[p]romote integrated review of the various city [c]odes concerned with development," "[a]ssure consistency with development regulations and plans," "protect neighboring owners and uses," promote "community growth," ensure vehicular and pedestrian safety, "[m]inimize conflicts that might otherwise be created by a mix of uses within allowed zones," etc. OHMC 19.48.010.

OHMC 19.48.040(3)(a) provides a "site plan approval shall be a Type IV review process when . . . [t]he director determines that based on departmental comments or public input there are significant unresolved concerns that are raised by the proposal." Here, the Department received a number of public comments about the Project and determined the Project would proceed under the Type IV review process. Under the Type IV review process, the Project would be considered during a hearing before a Hearing Examiner and subject to a decision by the City Council.

For the Hearing Examiner and City Council to approve the Site Plan, the

Project must comply with a number of OHMC provisions and the Oak Harbor Design Regulations and Guidelines.

The Department responded to PWH's application with review comments. The Department asked PWH to respond to comments regarding whether "the amount of retail space provided is not sufficient to meet the mixed-use provisions of the OHMC and Comprehensive Plan."

PWH submitted a revised application. PWH responded to the question about the mixed-use provisions by writing "[n]either the Compressive Plan nor the OHMC establish minimum or maximum amounts of retail space." Nevertheless, PWH increased the amount of proposed retail space from one 530 square foot space to two 550 square feet spaces, one on SE Pioneer Way and the other on Hal Ramaley Memorial Park. A "Community Courtyard" separated the retail spaces from the entrance to the residential space. PWH stated the Project met OHMC 19.08.550's definition of mixed use because it contains retail and residential spaces.[2]

The Department issued a Staff Report determining "the project is consistent with the applicable standards" and recommended the Hearing Examiner and City Council approve the Site Plan.

The Oak Harbor Hearing Examiner held a public hearing to consider the

---

[2] OHMC 19.08.550 defines "mixed use" as "properties on which various uses such as office, commercial, institutional and residential are combined in a single building or on a single site in an integrated development project with significant functional interrelationships and a coherent physical design. A 'single use' may include contiguous properties."

Project.[3]  One week later, the Hearing Examiner issued Findings of Fact and

Conclusions of Law.  The Hearing Examiner adopted the Department's

recommendations and recommended the City Council approve PWH's

application to develop the Project.

The City Council held a public meeting to conduct a closed record review

of the Hearing Examiner's decision and consider the Project.[4]  By a four to three

vote, the City Council approved the Hearing Examiner's recommendation and the

Project.

The Oak Harbor Main Street Association (OHMSA) objected and filed a

petition under the Land Use Petition Act (LUPA), chapter 36.70C RCW, in Island

County Superior Court.  OHMSA "is a nonprofit corporation whose members

include merchants and property owners in Oak Harbor's Central Business

District."  OHMSA's mission is to "promote a vibrant, historic waterfront

community and its stated core values include without limitation re-establishing

commerce in the downtown business district."

OHMSA argued the City Council's decision was,

> [A]n erroneous interpretation of the law, erroneous application of
> the law to the facts, not supported by the substantial evidence in

---

[3] OHMC 18.20.260 provides the Hearing Examiner's process for reviewing Type IV applications.  "The hearing examiner shall conduct the public hearing and issue a final decision for certain site plan approvals designated as Type IV in Chapter 19.48 OHMC and rezones designated as Type IV." OHMC 18.40.100(3).

[4] A closed record review is one where the "Council will review the record generated, up to and including the hearing examiner's decision, and we'll discuss and debate and deliberate without additional input by the public or the parties. No new evidence or testimony or argument will be permitted."

5

the record and otherwise contrary to law because project as proposed is inconsistent with the purpose, intent and specific regulations implementing the Central Business District zone as set forth in the Comprehensive Plan and . . . OHMC 19.20.300 through 330. Contrary to the purpose, intent and terms of and the regulations implementing the CBD zone, the proposed Pioneer Way Housing Project is comprised primarily of residential uses, improperly locates dwelling units on the ground floor, does not preserve and enhance a character of social, cultural and retail activity consistent with the traditional downtown center, does not include a composition of mixed uses as contemplated in the CBD and fails to promote, and instead hinders development of Pioneer Way street frontage with retail and visitor-oriented uses.

OHMSA also argued the City Council's decision was a *de facto* rezone, and the City Council did not properly follow the Type IV permit review process.

After reviewing the LUPA petition, the superior court entered judgment in favor of OHMSA, and reversed and vacated the City Council's approval of the Project. It did not reach OHMSA's boundary line adjustment, *de facto* rezone, and review process arguments. The superior court determined the Project violated the OHMC 19.20.305(45) because the Project's primary use was providing dwelling units, and thereby, could not be located outside of CBD-1 or CBD-2 subdistricts.

PWH filed a motion for reconsideration, which the superior court denied. The superior court entered final judgment reversing the City Council's approval of the Project. PWH appeals. The City is not a party to this appeal.

DISCUSSION

"In reviewing a land use decision, we stand in the same position as the superior court." Phoenix Development, Inc. v. City of Woodinville, 171 Wn.2d 820, 828, 256 P.3d 1150 (2011). We review de novo the issues of whether the

6

entity engaged in unlawful procedure or failed to follow a prescribed process and whether the entity's decision is an erroneous interpretation of law. Id.

We may grant a LUPA petition if the party seeking relief satisfies one of RCW 36.70C.130(1)'s six standards.[5] RCW 36.70C.130(1) provides, in relevant part:

> (a) The body or officer that made the land use decision engaged in unlawful procedure or failed to follow a prescribed process, unless the error was harmless;
> (b) The land use decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise;
> (c) The land use decision is not supported by evidence that is substantial when viewed in light of the whole record before the court;
> (d) The land use decision is a clearly erroneous application of the law to the facts.

LUPA "does not require a court to show complete deference [to the local entity], but rather, 'such deference as is due.'" Ellensburg Cement Prods., Inc. v. Kittitas County, 179 Wn.2d 737, 753, 317 P.3d 1037 (2014). We may reject a local entity's interpretation of an ambiguous statute. Id. at 735. When we review the issue of whether the entity's decision is supported by sufficient evidence, "we view facts and inferences in a light most favorable to the party that prevailed in the highest forum exercising fact-finding authority." Phoenix Development, 171 Wn.2d at 828-29. An entity's land use decision is a clearly erroneous application of the law when the superior court "is left with the definite and firm conviction that a mistake has been committed." Id. at 829.

---

[5] A "land use decision" is "a final determination by a local jurisdiction's body or officer with the highest level of authority to" grant project permits, and apply and enforce zoning, ordinances, and rules. RCW 36.70C.020(2).

"We interpret local ordinances the same as statutes." Sleasman v. City of Lacey, 159 Wn.2d 639, 643, 151 P.3d 990 (2007). "Where the plain language of a statute is unambiguous, and legislative intent is therefore apparent, we will not construe the statute otherwise." Ellensburg Cement Prods., 179 Wn.2d at 743.

OHMC 19.08.550 defines "mixed use" sites as those in which "various uses such as office, commercial, institutional and residential are combined in . . . an integrated development project with significant functional interrelationships and a coherent physical design."[6] PWH correctly argues that OHMC 19.08.550's definition of "mixed use" does not include a percentage or ratio for what is required to constitute mixed use. Here, the Project would develop 51 dwelling units and two retail spaces. So, it satisfies the plain meaning of mixed use. However, regardless of whether the Project is mixed use, we must determine whether it satisfies OHMC 19.20.305(45).

At issue is whether the dwelling units of the Project may be considered the "primary use" of the site. OHMC 19.08.675 defines "primary use" as "the principal or predominant use to which the property is or may be devoted, and to which all other uses on the premises are accessory."

PWH argues that "even if the affordable housing in the Project is the 'principal' or 'predominant' use, it cannot be the 'primary use' *unless* the retail uses will be 'accessory.' " (Emphasis added.) OHMC 19.08.015 defines an "accessory use" as "incidental or subordinate to the principal use and located on

_____

[6] A "dwelling unit" is "a building or portion thereof providing complete housekeeping facilities for one family." OHMC 19.08.270.

8

the same lot or in the same building as the principal use." PWH turns to OHMC 19.20.310 that describes "accessory permitted uses" such as satellite dishes and storage facilities to argue that those, unlike retail space, are examples of uses that are incidental and subordinate to a principal use.[7] Thus, PWH argues the Project's retail spaces could not be considered accessory because the retail spaces are not incidental and subordinate to the dwelling units.

PWH's reliance on OHMC 19.20.310 is misplaced. Listing examples of accessory permitted uses does not restrict what can be considered accessory to a principal or predominant use in OMHC 19.08.675.[8] Furthermore, OHMC 19.20.310 describes accessory permitted uses that apply to all of the CBD and its subdistricts. PWH's argument ignores the fact that language appears in OHMC 19.20.305(45)(b) that does not appear in OHMC 19.20.305(45)(a): "[i]n subdistricts CBD-1 or CBD-2: dwelling units may be the primary use of the site."

We discern an ordinance's meaning by examining "the statute in which the provision at issue is found, as well as related statutes or other provisions of the

---

[7] Each article of OHMC Chapter 19.20 provides its own definition of "accessory permitted uses." For example, both the multiple family residential district and the single family residential district permit "[a]ccessory uses and structures incidental to any permitted residential uses, such as servants' quarters, garages, greenhouses, or workshops; provided, that none shall be rented or occupied for gain." OHMC 19.20.205(1), OHMC 19.20.110(1).

[8] Also, an " '[i]ncidental or accessory secondary use' means a minor *or secondary use* for which a lot, structure or building is designed or employed in conjunction with but subordinate to its primary use." OHMC 19.08.730 (Emphasis added.)

same act in which the provision is found." State Dep't of Ecology v. Campbell & Gwinn, LLC, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002). Reading the ordinance to suggest that sites in the CBD, but outside of CBD-1 and CBD-2, may have dwelling units as the primary use would be contrary to OHMC 19.20.305(45). "Full effect must be given to the legislature's language, with no part rendered meaningless or superfluous." Sleasman, 159 Wn.2d at 646. Reading the ordinance to suggest that sites in the CBD zone may have sites with dwelling units as the primary use would render the "primary use" language in OHMC 19.20.305(45)(b) meaningless.

In the instant case, the Project's proposed site is within the CBD but not within subdistrict CBD-1 or CBD-2. The Project's proposed structure is 39,936 square feet, and only 1,100 of those square feet are dedicated retail space. While the Project satisfies the definition of mixed use, dwelling units are the predominant use to which the property is or may be devoted. Thus, the Project violates OHMC 19.20.305(45). This reading is also consistent with OHMC 19.20.300 that acknowledges the City established CBD-1 and CBD-2 as subdistricts "to provide for flexibility of residential development within specific areas of the central business district."

The City Council's approval of the Project was based on an erroneous interpretation of OHMC 19.20.305(45). We affirm the superior court's decision.

PWH asks this court to consider issues OHMSA asserted in its LUPA petition that the superior court did not address in its decision. Specifically, PWH request this court to address the issues of whether the council correctly approved

the boundary line adjustment, whether the council's decision was a *de facto* rezone, and whether the council used the correct procedures to make its decision.  Because we affirm the superior court's decision, we need not address these issues.  Affirmed.

_Cohen, J._

WE CONCUR:

_Bunn, J_        _Verellen, J_