

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| CITY OF SEATTLE, SEATTLE CITY LIGHT, | ) ) ) | No. 72344-8-I |
| Respondent/Cross-Appellant, | ) ) | |
| v. | ) ) | PUBLISHED OPINION |
| AARON SWANSON, | ) ) ) | |
| Appellant/Cross-Respondent. | ) | FILED: May 9, 2016 |

SCHINDLER, J. — The Local Government Whistleblower Protection Act, chapter 42.41 RCW, protects employees from retaliation for making a good faith report of improper governmental action. "Retaliatory action" is defined as either (a) any adverse change in the terms and conditions of employment or (b) hostile actions by another employee that "were encouraged by a supervisor or senior manager or official." RCW 42.41.020(3). A local government is exempt from the provisions of the Whistleblower Protection Act if it adopts a program that meets the intent of chapter 42.41 RCW. The city of Seattle (City) adopted a whistleblower protection ordinance to implement the provisions of chapter 42.41 RCW[1] but defined "retaliatory action" to mean only "any unwarranted adverse change in an employee's employment status or the terms and conditions of employment," former Seattle Municipal Code (SMC) 4.20.850(D) (1994).

[1] Seattle Ordinance 117039 (Feb. 9, 1994).

Seattle City Light employee Aaron Swanson appeals the superior court order reversing the decision of the administrative law judge (ALJ) that the City violated the state whistleblower statute, chapter 42.41 RCW. The City contends that because the former SMC meets the intent of the Whistleblower Protection Act, state law does not apply. In a cross appeal, the City argues in the alternative that substantial evidence does not support finding the City violated chapter 42.41 RCW. We hold the former SMC does not meet the intent of state law to protect City employees from hostile actions by another employee that were encouraged by a supervisor or senior manager and substantial evidence supports finding retaliation under chapter 42.41 RCW. We reverse the superior court and affirm the decision and order of the ALJ but remand to the ALJ to determine the amount of attorney fees and costs.

## FACTS

In February 2009, Seattle City Light (SCL) hired Aaron Swanson as a "lineworker" apprentice. The apprentice program required approximately 6,000 hours of training over the course of three years divided into six-month increments or "steps." The apprentice program included "coursework and exams as well as hands-on training in the field." Apprentices rotated between the North Service Center and the South Service Center and "received on-the-job training and monthly evaluations from the crew chiefs and lineworkers with whom they worked." Failure "to meet expectations" could lead to the imposition of "Individualized Training Programs" (ITPs) and extension or cancellation of the apprenticeship.

After graduating from climbing school, Swanson started the first step of the apprenticeship program on August 26, 2009. During his first year, Swanson "primarily

2

met expectations" but struggled with climbing skills. In October 2009, Crew Chief Damian Mims "scored Mr. Swanson as meeting expectations in five out of seven categories" but stated, "Aaron needs to focus on his climbing skills and technique as well as practicing knots [and] needs to be more aggressive toward the work." According to Crew Chief Lance Stotts, Swanson "agreed that he was not climbing as fast as others were, and that he was not fully comfortable with maneuvers."

During the summer of 2010, Swanson "received scores of 'exceeds expectations' on his URD (underground work) evaluation." In July 2010, Crew Chief Tom Caddy evaluated Swanson as meeting or exceeding expectations "in all categories" including "linework," but noted he needed training on "rigging" and "<u>TRAINING</u> NEEDS TO BE BETTER."[2]

In August, journey-level lineworker and instructor Ronald Allen told the apprentices he planned to give an oral test on the "Safety Standards for Electrical Workers." The test was not required as part of the apprenticeship program. After they all failed the test, Allen told the apprentices they needed to take the test again. When one of the apprentices asked something like, "Would a bottle help?," Allen "responded affirmatively to the group that a bottle of whiskey would help." On the day of the retest, every apprentice except Swanson brought a bottle of whiskey to give to Allen. The other apprentices got a bottle of whiskey for Swanson to give to Allen. Allen accepted a bottle of whiskey from each apprentice and each apprentice received a passing grade on the test.

In September 2010, SCL hired Allen as a craft instructor for the apprenticeship program. "Allen was the lead instructor for testing and training, and worked with

---

[2] Emphasis in original.

curriculum development and personalized training of apprentices as needed." Union business manager and Allen's uncle Joe Simpson appointed Allen to the Electrical Crafts Advisory Committee (ECAC). The ECAC makes recommendations "regarding the quality/control of all electrical crafts, including the lineworker apprenticeship program."

At a staff meeting in early 2011, Allen stated the "aim should be getting apprentices out of the apprenticeship program who were not a good fit." During 2011, Allen made "negative comments to and/or about" Swanson. Swanson believed Allen "negatively influenced his . . . daily interactions with the crew" and the March 2011 evaluation of Crew Chief Stotts. Crew Chief Stotts evaluated Swanson "with 'Concerns' or 'Does Not Meet Expectations' in every aspect, including climbing and rigging."

The City of Seattle Joint Apprenticeship Training Committee (JATC), three union representatives and three City members, administer the City apprenticeship programs and make recommendations about advancing apprentices to the next step and cancelling apprenticeships. On March 30, the JATC voted to extend Swanson's apprenticeship by an additional six months.

In June, Allen suggested Swanson "look into a different apprenticeship." In July, Allen "had a flyer delivered to Mr. Swanson containing four new apprenticeship openings along with the message that Mr. Swanson look into a different apprenticeship." The July evaluation of Swanson by Crew Chief Michael Brooks rated Swanson as falling "below expectations for a fourth-period apprentice with regard to climbing, rigging, and timeliness."

At the end of July, Allen told SCL lineworker Peggy Owens that "the best thing about going on vacation was having someone fired while he was gone." Allen told Owens the ECAC "was going to vote to fire someone." At the meeting on August 4, the ECAC voted to recommend canceling Swanson's apprenticeship.

In late August, Swanson filed a complaint with the Department of Labor and Industries, SCL Human Resources, and the Seattle Ethics and Elections Committee (SEEC) reporting Allen "extorted alcohol in exchange for passing test scores." Swanson "expressed concern that he was receiving poor and/or unfair performance evaluations because of Mr. Allen." Swanson's complaint was not the first report the SEEC had received about improper conduct by Allen.

SCL Human Resources conducted an investigation. Meanwhile, Swanson transferred to the South Service Center "where he felt more comfortable, even though Mr. Allen also worked out of the South Service Center." Swanson was assigned to Crew Chief Todd Warren. Warren was on the ECAC and is Allen's friend.

On September 15, Swanson made a "formal complaint" to the JATC. Swanson reported Allen "abused his position and is working to deny [Swanson's] ability to be a successful apprentice," and he "has engaged in acts of collusion with Todd Warren . . . and others in an effort to get [Swanson] fired." When Allen saw Swanson at the South Service Center on September 19, Allen "became upset and stated, 'You're just a fucking squeak.'" Later that day, Swanson saw Allen with a copy of the complaint to the JATC "in hand, showing it to groups of lineworkers on the dock."

Although Warren told the JATC that Swanson "worked too slow," the JATC "decided against cancellation" of his apprenticeship "because of evidence that Mr.

Swanson had progressed in a number of areas, and because he had not received adequate individualized instruction under his ITP." After working with another crew, Swanson's November performance evaluations "showed higher marks."

On December 13, SCL found Allen "improperly accepted alcohol from apprentices in exchange for a passing test score." SCL sent the investigative report and determination to the SEEC.

The SEEC interviewed Allen. Allen "was angry, thought the incident was a joke, and stated 'this is the way we roll.' " Allen "did not take personal responsibility for his behavior" and "believed SCL passed through too many apprentices at too high a cost," a "big shortcoming of the apprenticeship program."

In January 2012, Swanson saw a poster of himself in the hallway of the North Service Center with the word "RAT" written across his chest. Swanson "did not report it at the time or take it down because he did not want to cause commotion."

In February, SCL notified Allen "he had been recommended for suspension without pay for 20 working days for his improper extortion of alcohol." The February evaluation of Swanson completed by Crew Chief Campy contained "eraser marks on scores that were altered down." But the March evaluation from Crew Chief Fugate states Swanson met expectations in all categories except two.

SCL retained lawyer Ronald Knox to investigate whether in addition to accepting alcohol, Allen solicited alcohol from the apprentices in exchange for a passing grade on the test and to investigate "Swanson's retaliation claims." Knox issued a report on April 10. Knox found Allen "accepted and received alcohol from all apprentices on test day" and "on a more probable than not basis," Allen "responded affirmatively when asked,

'Would a bottle help?,' thus accepting alcohol in exchange for passing test scores." The report did not address Swanson's retaliation claims "because of the reticence of SCL employees" to talk to him.

On May 2, SCL found Allen violated SCL "Workplace Expectations" and the City's "Personnel Rules and Code of Ethics." SCL suspended Allen for 20 workdays effective May 3. The suspension meant Allen was not eligible for promotion for one year. On May 23, the JATC rejected the recommendation of the ECAC and decided to advance Swanson to the fifth period, "i.e. primary, 'hot' period," of his apprenticeship.

After Allen returned to work on May 31, Simpson removed Allen from the ECAC and appointed him to the JATC.

The evaluations completed by Crew Chief Bob Hernandez for June and July showed Swanson " 'met expectations' for all listed criteria.' " Crew Chief Hernandez stated, " 'He is doing a good job at listening and giving a good effort,' " but noted Swanson needed to improve his rigging skill.

On July 18, Swanson told the SCL Employee Relations Manager that at a union meeting on July 12, "Allen became combative," accusing Swanson of "stabbing him in the back." Swanson said Allen verbally attacked him and tried to provoke a physical fight.

In August, Swanson overheard Allen tell other lineworkers and a crew chief that "it was no longer fun working there anymore." When one of the lineworkers gestured toward Swanson, Allen said, "Don't worry, we'll take care of him hook, line, and sinker." In September, someone placed a "Pre-Apprentice Lineworker" (PAL) sticker on Swanson's locker.

On October 11, SCL Crew Chief Gary Legere evaluated Swanson. The evaluation states Swanson "Meets Expectations" in 10 out of 14 categories. The evaluation notes "Concerns" and a "Does Not Meet Expectations" for rigging and recommends additional ECAC training.

On November 1, the SEEC notified Allen that it intended to file charges against him for ethics violations. The City ethics rules prohibit the acceptance of gifts "given with the intent to receive special consideration from a city employee."

On November 5, The Seattle Times published an article on the Internet about the ethics violation, "Ethics Fines May Follow Gifts of Liquor to City Light Trainer." The article states, in pertinent part:

> A Seattle City Light employee may face penalties under city ethics rules for accepting bottles of liquor from apprentices in a lineworker training program for which he administered the test to advance.
>
> Ronald Allen, an instructor for the apprentice program since 2005, received nine bottles of whiskey or other liquor from trainees who were about to retake an oral exam that he said some had failed during a previous attempt.
>
> Wayne Barnett, director of the Seattle Ethics and Elections Commission, said Allen's actions violate city ethics rules . . . . "We think that accepting liquor from people to whom you're about to administer a test is clearly inappropriate," Barnett said.

Two days later, someone claiming to be Swanson posted an online comment to the article. The comment states:

> Hi my name is Arron [sic] Swanson I was the one that brought all this up to save my job. I have not been doing well here at the city and this is my way of proving a point and saving my job that I might not have for much longer. I am saddened for what I have done to my union brother but it is already done. Sincerely Arron [sic] Swanson Seattle city light scc.

Swanson did not post the comment and was unable to determine who posted the

comment.

On November 9, 2012, Swanson filed a complaint for unlawful whistleblower retaliation under "SMC 4.20.860 and RCW 42.41.040." Under former SMC 4.20.860(A) (1994), an employee must file a whistleblower retaliation complaint "within 30 days of the occurrence alleged to constitute retaliation."

On February 11, 2013, Knox issued a supplemental investigative report finding Allen inappropriately accepted gifts of alcohol in exchange for a passing grade on the oral test.

> Allen inappropriately accepted gifts of alcohol from nine preapprentices under circumstances that suggested providing such gifts would assure a passing grade in an oral examination.

Knox also found Allen retaliated against Swanson and engaged in lobbying efforts to evaluate Swanson "more poorly than was justified."

> The evidence also suggests and I find that on a more probable than not basis, Allen engaged in lobbying activities directed at the Initiating Witness [Mr. Swanson]. There is evidence that the conduct escalated after the Initiating Witness provided information to SCL about Allen's alleged solicitation of alcohol from Apprentices. This involved at least lobbying efforts with crews to evaluate the Initiating Witness more poorly than was justified. This conduct appears retaliatory in nature and contrary to SCL Policy (Rule 1.3.4) and the City of Seattle Code of Ethics. SMC 4.16.070.
>
> . . . .
>
> Several witnesses told Mr. Knox that Mr. Allen talked with them about Mr. Swanson. Journey-level workers reported that Mr. Allen lobbied them to negatively impact Mr. Swanson's evaluations. None of the crew chiefs admitted being affected by Mr. Allen's lobbying.

But Knox was "unable to conclusively determine specifically which performance reviews were the result of Mr. Allen's lobbying efforts" and documented "significant

unexpected limitations" regarding the investigation, including the refusal to answer questions or provide "critical information due to perceived fear of retaliation."

> [T]he "considerable and significant unexpected limitations" regarding his investigation, which included: (a) "extraordinary delays and/or total refusals" by various journeymen and their union representatives to meet and/or answer specific questions concerning the various allegations", (b) "refusal of witness to provide critical information due to perceived fear of retaliation from other union members," (c) witnesses' fear of speaking freely to Mr. Knox with the union representative present; and (d) refusal to give specifics and details due to fear of being identified as the provider, resulting in limited access and relationship with those who shared the information with them.

The ALJ conducted an eight-day hearing from February 12 until June 25, 2013 on Swanson's whistleblower retaliation complaint. A number of witnesses testified at the hearing including Swanson, Allen, Knox, Crew Chief Legere, and Crew Chief Caddy. The ALJ admitted into evidence over 50 exhibits, including a May 23, 2013 supplemental investigative report of Knox.

The May 23, 2013 supplemental investigative report of Knox addressed "whether Mr. Allen retaliated against Mr. Swanson at the July 12, 2012 union meeting, and whether Mr. Legere's performance evaluation approximately three months after this union meeting was retaliatory." Knox could not determine what occurred at the union meeting. Knox concluded there was no " 'nexus between the Legere evaluation and the July 12, 2012 meeting.' "

> Knox stated he could not conclusively determine what exactly happened at the July 12, 2012 union meeting due to the conflicting, credible witness statements, and that he could "find no independent evidence of a nexus between the Legere evaluation and the July 12, 2012 meeting." Mr. Knox found Mr. Swanson credible, and his notes of the incident credible. Mr. Knox found Mr. Allen and Mr. Warren credible at times, and not credible at other times. Mr. Knox found Mr. Legere "very" credible. Mr. Knox concluded, "Based on the evidence available, I do not sustain the

10

allegations of retaliation against Mr. Allen and Mr. Legere associated with the charges made."

The ALJ issued a detailed 20-page decision, "Findings of Fact, Conclusions of Law, & Final Order." The ALJ found that after Swanson reported Allen "solicited and accepted alcohol from apprentices in exchange for a passing grade on an oral exam," Allen "lobbied line workers and crew chiefs to downgrade Mr. Swanson's performance evaluations in an attempt to cancel his apprenticeship." However, because the whistleblower retaliation complaint was filed in November 2012, the ALJ addressed only the October 2012 evaluation of Crew Chief Legere. The ALJ found Swanson did not establish Crew Chief Legere's evaluation was influenced by Allen. The ALJ concluded the evaluation did not constitute "retaliation against Mr. Swanson under Chapter 42.41 RCW and Chapter 4.20 SMC."

> Although Mr. Legere's evaluation was unsatisfactory in that it stated Mr. Swanson was not performing up to step in all areas, and that he needed additional training, Mr. Swanson has not established by a preponderance of the evidence that Mr. Allen in any way influenced Legere's evaluation. Mr. Swanson's problem areas as identified by Mr. Legere were nothing new to Mr. Swanson; crew chiefs had made similar comments regarding Mr. Swanson's rigging skills and preparation for years. In addition, in ten out of fourteen categories Mr. Legere found Mr. Swanson "Met Expectations." Mr. Legere circled "ECAC" not to threaten Mr. Swanson's apprenticeship or hold him back, but to get him the training he needed to improve, for his own safety and the safety of his fellow lineworkers.

The ALJ found that posting a PAL sticker on Swanson's locker "and the impersonation of Mr. Swanson to the Seattle Times were undoubtedly hostile actions taken by SCL employees." However, because the PAL sticker was placed on Swanson's locker more than 30 days prior to filing the whistleblower retaliation complaint, the ALJ did not consider it in determining whether SCL retaliated against Swanson. The ALJ concluded Allen retaliated by "either vocally or tacitly

11

encourage[ing]" the impersonation of Swanson in the Seattle Times online comment, if not posting the comment himself, in violation of chapter 42.41 RCW. Conclusion of law 5.10 states:

> The PAL sticker and the impersonation of Mr. Swanson to the Seattle Times were undoubtedly hostile actions taken by SCL employees toward Mr. Swanson that Mr. Allen either vocally or tacitly encouraged, if not performed himself. Because I find that the PAL sticker was first on Mr. Swanson's locker earlier than 30 days prior to Mr. Swanson's retaliation complaint to the Office of the Mayor, I do not consider it in determining whether SCL violated Chapter 42.41 RCW and Chapter 4.20 SMC. However, at the time the impersonation of Mr. Swanson to the Seattle Times took place, Mr. Allen was in a secondary supervisory position with the City over Mr. [Swanson] because of his participation with the JATC, a City committee with authority to negatively impact Mr. [Swanson]'s apprenticeship. Consequently, Mr. Allen's encouragement and/or commission of the impersonation of Mr. Swanson publicly to the Seattle Times is actionable retaliation under Chapter 42.41 RCW.

The ALJ recommended suspending Allen for six months and ordered the City to pay Swanson attorney fees and costs incurred in bringing his whistleblower retaliation claim under chapter 42.41 RCW.

On October 17, 2013, the City filed a petition for judicial review in superior court. The City argued the ALJ erred in relying on the state law definition of "retaliatory action" rather than the definition of "retaliatory action" under former SMC 4.20.850(D). In the alternative, the City argued substantial evidence did not support finding retaliation under state law.[3]

The superior court ruled the ALJ erred "as a matter of law in relying on the definition of retaliation found in RCW 42.41.020(3)(b)." The court concluded that while

---

[3] Allen also filed a petition for judicial review challenging the assessment of a $1,000 fine against him. Allen argued the fine violated his right to due process. Swanson and the City stipulated the fine should be stricken.

the impersonation of Swanson "may be sufficient to constitute retaliatory action pursuant to RCW 42.41.020(3)(b), it is insufficient under [former] SMC 4.20.850(D)."

> No evidence was presented that the impersonation resulted in any unwarranted adverse change in Mr. Swanson's employment status or the terms and conditions of his employment. The ALJ's failure to cite SMC 4.20.850(D) in conjunction with RCW 42.41 appears to be a tacit acknowledgment of that deficiency.

The court rejected the City's argument that even if the state law definition of "retaliation" applied, the record did not support finding a SCL employee "posted the comment or that Mr. Allen encouraged the conduct." The court concluded that "[w]hile the record on this issue is not well developed, it is clear that the individual who posted the comment had 'insider' information not known to the general public" and was "encouraged to act by the behavior and conduct of Mr. Allen."

> Given the historical context and Mr. Allen's prior dealings with Mr. Swanson, a reasonable inference can be drawn that the poster was a City Light insider who was encouraged to act by the behavior and conduct of Mr. Allen. Other potential "suspects" may exist, but the burden of proof is merely a preponderance of the evidence and no other individuals were identified with similar interests or motives. Accordingly, this Court finds that the record is sufficient to support the ALJ's factual finding.

The court reversed the decision and order of the ALJ. On reconsideration, Swanson argued that because the former SMC did not meet the intent of state law to protect whistleblowers from hostile actions encouraged by a supervisor or senior manager, the ALJ did not err in relying on the state law definition of "retaliatory action" under RCW 42.41.020(3)(b). The court denied the motion for reconsideration.

ANALYSIS

Swanson appeals the superior court decision reversing the ALJ. Swanson contends the ALJ did not err in relying on the state law definition of "retaliatory action"

13

under RCW 42.41.020(3)(b). The City claims that because the former SMC complies with the intent of state law, the state law definition of "retaliatory action" does not apply.

The Washington Administrative Procedure Act (WAPA), chapter 34.05 RCW, governs our review. In reviewing administrative action, we sit "in the same position as the superior court" and apply the standards of the WAPA directly to the agency decision. Tapper v. Emp't Sec. Dep't, 122 Wn.2d 397, 402, 858 P.2d 494 (1993). We will reverse the agency order if the decision is based on an erroneous interpretation or application of the law. RCW 34.05.570(3)(a). The party challenging an agency decision must establish error and demonstrate the agency action is invalid. RCW 34.05.570(1)(a).

The interpretation of a statute is a question of law reviewed de novo. City of Spokane v. Rothwell, 166 Wn.2d 872, 876, 215 P.3d 162 (2009); Ellensburg Cement Prods., Inc., v. Kittitas County, 179 Wn.2d 737, 743, 317 P.3d 1037 (2014). We also construe a municipal ordinance according to the rules of statutory interpretation. Ellensburg Cement, 179 Wn.2d at 743.

When interpreting a statute, our objective is to ascertain and give effect to legislative intent. Ellensburg Cement, 179 Wn.2d at 743. Statutory interpretation begins with the plain meaning of the statute. Lake v. Woodcreek Homeowners Ass'n, 169 Wn.2d 516, 526, 243 P.3d 1283 (2010). When the meaning of statutory language is plain on its face, we give effect to that plain meaning as an expression of legislative intent. City of Spokane v. Spokane County, 158 Wn.2d 661, 673, 146 P.3d 893 (2006). If the plain language is subject to only one interpretation, our inquiry is at an end. Lake, 169 Wn.2d at 526.

14

We construe a statute " 'so that all the language used is given effect, with no portion rendered meaningless or superfluous.' " Rapid Settlements, Ltd. v. Symetra Life Ins. Co., 134 Wn. App. 329, 332, 139 P.3d 411 (2006) (quoting Prison Legal News, Inc. v. Dep't of Corr., 154 Wn.2d 628, 644, 115 P.3d 316 (2005)). We " 'must not add words where the legislature has chosen not to include them.' " Lake, 169 Wn.2d at 526 (quoting Rest. Dev., Inc. v. Cananwill, Inc., 150 Wn.2d 674, 682, 80 P.3d 598 (2003)). We consider a provision "within the context of the regulatory and statutory scheme as a whole." ITT Rayonier, Inc. v. Dalman, 122 Wn.2d 801, 807, 863 P.2d 64 (1993) (cited in Dep't of Ecology v. Campbell & Gwinn, LLC, 146 Wn.2d 1, 10-11, 43 P.3d 4 (2002)). We avoid an interpretation that results in unlikely or strained consequences. Broughton Lumber Co. v. BNSF Ry., 174 Wn.2d 619, 635, 278 P.3d 173 (2012).

The plain and unambiguous intent of the Local Government Whistleblower Protection Act, chapter 42.41 RCW, is to protect local government employees who make a good faith report of improper actions taken by officials and employees and provide remedies for whistleblowers subjected to retaliation for making such reports. RCW 42.41.010 states:

> **Policy.** It is the policy of the legislature that local government employees should be encouraged to disclose, to the extent not expressly prohibited by law, improper governmental actions of local government officials and employees. The purpose of this chapter is to protect local government employees who make good-faith reports to appropriate governmental bodies and to provide remedies for such individuals who are subjected to retaliation for having made such reports.

RCW 42.41.020(3) defines "retaliatory action" as (a) any adverse change in the employee's terms or conditions of employment or (b) hostile actions by another

15

employee that were encouraged by a supervisor or senior manager. RCW 42.41.020(3) states:

> "Retaliatory action" means: (a) Any adverse change in a local government employee's employment status, or the terms and conditions of employment including denial of adequate staff to perform duties, frequent staff changes, frequent and undesirable office changes, refusal to assign meaningful work, unwarranted and unsubstantiated letters of reprimand or unsatisfactory performance evaluations, demotion, transfer, reassignment, reduction in pay, denial of promotion, suspension, dismissal, or any other disciplinary action; or (b) hostile actions by another employee towards a local government employee that were encouraged by a supervisor or senior manager or official.[4]

RCW 42.41.030(1) gives "[e]very local government employee . . . the right to report . . . information concerning an alleged improper governmental action." RCW 42.41.040(1) makes it unlawful "for any local government official or employee to take retaliatory action against a local government employee because the employee provided information in good faith in accordance with the provisions of this chapter that an improper governmental action occurred."

RCW 42.41.050 provides that if a local government adopts a program that "meets the intent of this chapter" to protect an employee from reporting alleged improper governmental actions and retaliation, it "shall be exempt from this chapter." RCW 42.41.050 states:

> Any local government that has adopted or adopts a program for reporting alleged improper governmental actions and adjudicating retaliation resulting from such reporting shall be exempt from this chapter if the program meets the intent of this chapter.[5]

The City argues the exemption applies because the former SMC meets the intent of the Local Government Whistleblower Protection Act. Swanson asserts the remedy

---

4 Emphasis added.
5 Emphasis added.

for "retaliatory action" under the former SMC does not meet the intent of state law to protect local government employees from hostile actions of other employees encouraged by a supervisor or senior manager. Under the plain and unambiguous language of chapter 42.41 RCW and the former SMC, we agree with Swanson.

The City expressly adopted the whistleblower protection ordinance to implement state law. Specifically, the state law definition of "retaliatory action," RCW 42.41.030 and RCW 42.41.040, making retaliation unlawful. Former SMC 4.20.800 (1994) states:

> **Policy — Purpose.**
> Unless prohibited by State law, City employees are encouraged to report on improper governmental action to the appropriate City or other government official, depending on the nature of the improper governmental action. <u>To assist such reporting and to implement Sections 42.41.030 and 42.41.040 of the Revised Code of Washington ("RCW"), Sections 4.20.800 through 4.20.860 provide City employees a process for reporting improper governmental action and protection from retaliatory action for reporting and cooperating in the investigation and/or prosecution of improper governmental action in good faith</u> in accordance with this subchapter.[6]

The plain language of RCW 42.41.020(3) protects a whistleblower employee not only from adverse changes to the terms and conditions of employment, but also from the hostile actions by another employee that were encouraged by a supervisor, senior manager, or official. By contrast, the plain language of former SMC 4.20.850(D) defines "retaliatory action" as only an adverse change in the terms and conditions of employment. Former SMC 4.20.850(D) states:

> "Retaliate," and its kindred nouns, "retaliation" and "retaliatory action," mean to make, because of an activity protected under section 4.20.810, any unwarranted adverse change in an employee's employment status or the terms and conditions of employment including, but not limited to, denial of adequate staff to perform duties; frequent staff changes; frequent and undesirable office changes; refusal to assign meaningful work; unsubstantiated letters of reprimand or unsatisfactory performance

---

[6] Emphasis added.

evaluations; demotion, reduction in pay; denial of promotion; transfer or reassignment; suspension or dismissal; or other unwarranted disciplinary action.

Because the plain language of former SMC 4.20.850(D) did not provide a remedy for a whistleblower who is subjected to hostile actions by another employee that are encouraged by a supervisor, senior manager, or official as required by state law, RCW 42.41.020(3)(b), we conclude the former SMC does not meet the intent of state law.[7]

Our conclusion that the remedy for a whistleblower reporting hostile actions by employees encouraged by a supervisor or senior manager as provided under former SMC 4.20.800 through .860 did not meet the intent of state law is reinforced by the recent amendment of the SMC. In December 2013, the Seattle City Council added a provision that expressly protects employees from retaliation by "a supervisor or superior who behaves in, or encourages coworkers to behave in, a hostile manner toward the employee." SMC 4.20.805.

The City's reliance on Woodbury v. City of Seattle, 172 Wn. App. 747, 292 P.3d 134 (2013), to argue the former SMC definition of "retaliatory action" meets the intent of state law is unpersuasive.

In Woodbury, Seattle Fire Department Deputy Chief Woodbury filed a complaint against the Seattle Fire Department for failure to submit a bill for services. Woodbury, 172 Wn. App. at 749. Chief Woodbury filed a whistleblower retaliation complaint. Woodbury, 172 Wn. App. at 749. After the City determined the Seattle Fire Department

---

[7] For the first time at oral argument, the City claimed the definition of "retaliatory action" under former SMC 4.20.850(D) included hostile actions encouraged by a supervisor. We do not consider arguments raised for the first time at oral argument. RAP 12.1(a). In any event, the plain and unambiguous definition under former SMC 4.20.850(D) addressed only "adverse change in an employee's employment status or the terms and conditions of employment" and not hostile actions as defined by state law.

did not retaliate by demoting him to battalion chief, Woodbury filed an administrative appeal and a lawsuit against the City. Woodbury, 172 Wn. App. at 749.

We held that because the procedures the City adopted allowing a whistleblower to file a complaint and report improper governmental conduct with the City and request an administrative hearing were consistent with state law, Chief Woodbury did not have the right to file a cause of action in superior court. Woodbury, 172 Wn. App. at 751-52.

> RCW 42.41.040(9) explicitly contemplates that the superior court sits in an appellate role . . . . Read as a whole, it is clear that RCW 42.41.040 does not grant local government employees a cause of action in superior court.

Woodbury, 172 Wn. App. at 752. The opinion in Woodbury does not address whether the SMC met the intent of state law to provide a remedy for a whistleblower subjected to "retaliatory action" as defined by state law. See Berschauer/Phillips Constr. Co. v. Seattle Sch. Dist. No. 1, 124 Wn.2d 816, 824, 881 P.2d 986 (1994) ("In cases where a legal theory is not discussed in the opinion, that case is not controlling on a future case where the legal theory is properly raised.").

We hold the ALJ did not err in relying on RCW 42.41.020(3)(b) to conclude the impersonation of Swanson to The Seattle Times was "undoubtedly" a hostile action "taken by SCL employees toward Mr. Swanson that Mr. Allen either vocally or tacitly encouraged, if not performed himself."

Even if the definition of retaliatory action under RCW 42.41.020(3)(b) applies, the City claims the record does not support the finding that the impersonation of Swanson to The Seattle Times was a hostile action "taken by SCL employees toward Mr. Swanson that Mr. Allen either vocally or tacitly encouraged." The City argues substantial evidence does not support finding a SCL employee posted the comment,

Allen encouraged a SCL employee to post the comment, or Allen was a supervisor when the comment was posted.

We review the ALJ findings of fact for substantial evidence. Port of Seattle v. Pollution Control Hearings Bd., 151 Wn.2d 568, 588, 90 P.3d 659 (2004). Substantial evidence is a sufficient quantity of evidence to persuade a fair-minded person of the truth or correctness of the agency action. Port of Seattle, 151 Wn.2d at 588. Our review for substantial evidence is deferential. See City of Univ. Place v. McGuire, 144 Wn.2d 640, 652-53, 30 P.3d 453 (2001). We will overturn the ALJ findings only if they are clearly erroneous and we are " 'definitely and firmly convinced that a mistake has been made.' " Port of Seattle, 151 Wn.2d at 588 (quoting Buechel v. Dep't of Ecology, 125 Wn.2d 196, 202, 884 P.2d 910 (1994)).

We view the "evidence and reasonable inferences therefrom in the light most favorable to the party who prevailed at the administrative proceeding below." Kirby v. Emp't Sec. Dep't, 185 Wn. App. 706, 713, 342 P.3d 1151 (2014); William Dickson Co. v. Puget Sound Air Pollution Control Agency, 81 Wn. App. 403, 411, 914 P.2d 750 (1996). We will not substitute our judgment for that of the ALJ regarding credibility of witnesses or the weight of conflicting evidence. Beatty v. Fish & Wildlife Comm'n, 185 Wn. App. 426, 449, 341 P.3d 291 (2015); Port of Seattle, 151 Wn.2d at 588. Unchallenged findings are verities on appeal. Postema v. Pollution Control Hearings Bd., 142 Wn.2d 68, 100, 11 P.3d 726 (2000).

The comment posted in response to the Seattle Times article about the ethics violation of Allen states:

> Hi my name is Arron [sic] Swanson I was the one that brought all this up to save my job. I have not been doing well here at the city and this is my

20

way of proving a point and saving my job that I might not have for much longer. I am saddened for what I have done to my union brother but it is already done. Sincerely Arron [sic] Swanson Seattle city light scc.

Substantial evidence supports finding a SCL employee or Allen retaliated against Swanson by posting the comment. There is no dispute Swanson did not post the comment. The comment contains information known only to SCL employees. Specifically, that Swanson reported Allen's improper conduct and that he had struggled during the apprenticeship program. The unchallenged findings establish SCL lineworkers and crew chiefs knew Swanson filed a complaint against Allen for soliciting and accepting a bottle of whiskey from each apprentice in exchange for a passing grade. The unchallenged record shows Allen lobbied lineworkers and crew chiefs to give Swanson negative performance evaluations, and after Swanson filed the complaint, Allen "escalated" his efforts to retaliate against Swanson. Allen made clear that "we'll take care of [Swanson] hook, line, and sinker."

Substantial evidence also supports finding Allen "was in a secondary supervisory position" over Swanson. There is no dispute Allen was a member of the JATC and the JATC had the "authority to negatively impact Mr. [Swanson]'s apprenticeship."

Viewing the record in the light most favorable to Swanson, substantial evidence supports the findings and conclusion that the City retaliated against Swanson in violation of state law.

We reverse the superior court and affirm the decision and order of the ALJ but remand to determine the amount of attorney fees and costs.[8]

Schindler, J

WE CONCUR:

Leach, J.

Dwyer, J.

---

[8] The parties do not dispute the provisions of former SMC shall apply to the request for an award of attorney fees and costs.