# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

THE HOUSING AUTHORITY OF THE
COUNTY OF KING, a Washington
municipal corporation,

                Appellant,

      v.

ANGELA KNIGHT, and all occupants,
including ANDRE KNIGHT and
DELANEY KNIGHT,

                Respondents.

DIVISION ONE

No. 85031-8-I

PUBLISHED OPINION

DWYER, J. — Does the federal Coronavirus Aid, Relief, and Economic Security Act[1] (CARES Act) require 30 days' notice for any eviction from dwellings covered by the Act? With all due respect to our colleagues at Division II, we conclude that the answer is no.[2] The CARES Act requires such notice only for evictions stemming from a tenant's nonpayment of rent.

I

In January 2023, the King County Housing Authority served a notice to vacate on a rental unit, alleging that its occupants had engaged in nuisance and criminal activity on the premises. The unit was occupied by Angela Knight, Andre Knight, and Delaney Knight. The notice provided them with three days to vacate the unit. Three days later, they had not done so. The Housing Authority

---

[1] Pub. L. No. 116-136, 134 Stat. 281 (2020) (codified at 15 U.S.C. ch. 116).
[2] See infra Section III. E.

subsequently filed an unlawful detainer petition and a motion to show cause in King County Superior Court.

A superior court commissioner denied the Housing Authority's petition and dismissed its eviction action without prejudice. The commissioner stated that he had relied on our opinion in Sherwood Auburn LLC v. Pinzon, 24 Wn. App. 2d 664, 521 P.3d 212 (2022), review denied, 1 Wn.3d 1005 (2023), to conclude that the CARES Act requires 30 days' notice for all evictions from dwellings covered by the Act, and that, regardless of the Housing Authority's asserted basis for evicting the Knights, it had only given them three days' notice.[3]

The Housing Authority now appeals.[4]

II

The superior court commissioner herein dismissed the Housing Authority's unlawful detainer action in reliance on our opinion in Pinzon. However, because that opinion did not resolve the matter presented herein, such reliance was misplaced.

In the Pinzon opinion, we summarized that,

> [t]he federal CARES Act, enacted by Congress in response to the economic disruption resulting from the COVID-19 pandemic, provides protections for tenants living in housing units owned by landlords that have received the financial benefits of certain federal

---

[3] The Housing Authority did not dispute that the Knights' rental unit was a dwelling covered by the CARES Act.

[4] The King County Bar Association's Housing Justice Project requested to participate in this appeal as an amicus curiae. A commissioner of this court approved its request. The Housing Justice Project's suggestions discussed herein are not treated as assertions by a party to this appeal but, rather, as thoughtful contributions intended to aid us in our deliberations.

The Housing Justice Project also requests to intervene in this matter. Because its interest is insufficient to justify intervention, we deny its request. Sutton v. Hirvonen, 113 Wn.2d 1, 8, 775 P.2d 448 (1989) (citing CR 24(a); RAP 1.2(a); RAP 18.8(a)).

programs. 15 U.S.C. § 9058. The statute applies to tenants living in any "covered dwelling," which includes housing units on properties with "[f]ederally backed mortgage loan[s]." 15 U.S.C. § 9058(a)(1), (2)(B)(i). In addition to imposing a 120-day moratorium on eviction actions for nonpayment of rent or other charges, 15 U.S.C. § 9058(b), the CARES Act established a 30-day notice requirement, which provides that "[t]he lessor of a covered dwelling unit . . . may not require the tenant to vacate the covered dwelling unit before the date that is 30 days after the date on which the lessor provides the tenant with a notice to vacate." 15 U.S.C. § 9058(c)(1).

Pinzon, 24 Wn. App. 2d at 671-72 (alterations in original). We stated that,

[i]n the federal CARES Act, Congress mandated that landlords who have accepted certain federal financial benefits must provide to tenants living in covered housing units a 30-day notice to cure the rental payment deficiency or vacate the premises before the landlord may commence an eviction action.

Pinzon, 24 Wn. App. 2d at 667 (footnote omitted) (citing 15 U.S.C. § 9058).

The tenants therein had fallen behind on their rent as a result of the economic fallout of the COVID-19 pandemic. Pinzon, 24 Wn. App. 2d at 668. Their landlord had issued them two notices to vacate, a 14-day notice stemming from their failure to pay rent and a 30-day notice stating that such notice period would begin upon a superior court's order to vacate. Pinzon, 24 Wn. App. 2d at 668-69. On appeal, and as pertinent here, the parties disputed whether "lessor" as set forth in the 30-day notice to vacate provision of the CARES Act meant a lessor or a superior court. Pinzon, 24 Wn. App. 2d at 672-73. We concluded that "lessor" meant lessor and reversed and remanded the matter. Pinzon, 24 Wn. App. 2d at 672-76, 681-82 (quoting 15 U.S.C. § 9058(c)(1)).

Pinzon does not resolve the matter before us. Nowhere in that opinion did we set forth a holding that the CARES Act requires 30 days' notice to vacate in

3

all eviction actions in dwellings covered by the Act. Moreover, the tenants therein had received the notices to vacate arising from their nonpayment of rent, and the extent of our interpretation of the CARES Act was whether a "lessor" was a lessor under the Act.

In contrast, the notice to vacate herein stemmed from the Knights' alleged nuisance and criminal conduct on the premises, and we are tasked with interpreting whether the Act requires 30 days' notice for all eviction actions regarding a dwelling covered by the Act. Thus, we plainly did not decide in Pinzon the matter now before us. Accordingly, by so relying on that opinion to dismiss the Housing Authority's unlawful detainer action herein, the superior court commissioner erred. [5] However, because Pinzon does not resolve the matter before us, we next look for guidance from the text of the CARES Act itself.

III

The Housing Authority asserts that the CARES Act requires 30 days' notice only for evictions stemming from nonpayment of rent. The Housing Authority is correct.

---

[5] We note that we repeatedly stated in Pinzon that the Act's 30-day notice provision applied to evictions stemming from a tenant's nonpayment of rent. 24 Wn. App. 2d at 667, 672, 679-80 ("cure the rental payment deficiency or vacate," "pay or vacate notice"). However, we did not analyze whether that provision *only* applied to such circumstances. In the analysis that follows, we do so now.

A

The CARES Act is a federal enactment. In interpreting such an enactment, our objective is to ascertain Congress's intent. Kitsap County Consol. Hous. Auth. v. Henry-Levingston, 196 Wn. App. 688, 701, 385 P.3d 188 (2016).[6] "'[I]f the statute's meaning is plain on its face, then [we] must give effect to that plain meaning as an expression of legislative intent.'" Pinzon, 24 Wn. App. 2d at 670 (alterations in original) (quoting Dep't of Ecology v. Campbell & Gwinn, LLC, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002)). A statute's plain meaning is derived from inquiring into "all that the Legislature has said in the statute and related statutes which disclose legislative intent about the provision in question." Dep't of Ecology, 146 Wn.2d at 11.

> In determining the plain meaning of a statute, we consider "the ordinary meaning of words, the basic rules of grammar, and the statutory context to conclude what the legislature has provided for in the statute and related statutes." In re Forfeiture of One 1970 Chevrolet Chevelle, 166 Wn.2d 834, 839, 215 P.3d 166 (2009). In so doing, we "construe a statute 'so that all the language used is given effect, with no portion rendered meaningless or superfluous.'" Seattle City Light v. Swanson, 193 Wn. App. 795, 810, 373 P.3d 342 (2016) (internal quotation marks omitted) (quoting Rapid Settlements, Ltd. v. Symetra Life Ins. Co., 134 Wn. App. 329, 332, 139 P.3d 411 (2006)). "Common sense informs our analysis, as we avoid absurd results in statutory interpretation." State v. Alvarado, 164 Wn.2d 556, 562, 192 P.3d 345 (2008).

Linville v. Dep't of Ret. Sys., 11 Wn. App. 2d 316, 321, 452 P.3d 1269 (2019).

---

[6] A superior court commissioner's interpretation of a statute involves a question of law which we review de novo. See Faciszewski v. Brown, 187 Wn.2d 308, 313-14, 386 P.3d 711 (2016) (citing King County v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd., 142 Wn.2d 543, 555, 14 P.3d 133 (2000)); Dep't of Ecology v. Campbell & Gwinn, LLC, 146 Wn.2d 1, 9, 43 P.3d 4 (2002) (citing State v. Breazeale, 144 Wn.2d 829, 837, 31 P.3d 1155 (2001); State v. J.M., 144 Wn.2d 472, 480, 28 P.3d 720 (2001)).

"[I]f, after this inquiry, the statute remains susceptible to more than one reasonable meaning, the statute is ambiguous and it is appropriate to resort to aids to construction, including legislative history." Dep't of Ecology, 146 Wn.2d at 12 (citing Cockle v. Dep't of Lab. & Indus., 142 Wn.2d 801, 808, 16 P.3d 583 (2001); Timberline Air Serv., Inc. v. Bell Helicopter-Textron, Inc., 125 Wn.2d 305, 312, 884 P.2d 920 (1994)). "'However, a statute is not ambiguous merely because of different conceivable interpretations.'" Smith v. Dep't of Lab. & Indus., 22 Wn. App. 2d 500, 507, 512 P.3d 566 (quoting Bennett v. Seattle Mental Health, 166 Wn. App. 477, 483-84, 269 P.3d 1079 (2012)), review denied, 200 Wn.2d 1013 (2022).

B

The United States Congress enacted the CARES Act on March 27, 2020 "in response to the economic disruption resulting from the COVID-19 pandemic." Pinzon, 24 Wn. App. 2d at 671-72.

At issue herein is a 30-day notice to vacate provision set forth in the CARES Act bill, located within Section 4024, "Temporary Moratorium on Eviction Filings." That section reads, in pertinent part, as follows:

> **SEC. 4024 TEMPORARY MORATORIUM ON EVICTION FILINGS**
>     (a) DEFINITIONS[7]. . .
>     . . . .
>     (b) MORATORIUM.—During the 120-day period beginning on the date of enactment of this Act, the lessor of a covered dwelling may not—

---

[7] Section 9058(a) sets forth the definition of "covered dwelling" to identify the manner and type of housing to be affected by the provisions of subsections (b) and (c). See Pinzon, 24 Wn. App. 2d at 672 (quoting 15 U.S.C. §§ 9058(a)(1), (2)(B)(i)). As applicable here, section (a) does not define "notice" or "nonpayment of rent." See 15 U.S.C. § 9058(a).

> (1) make, or cause to be made, any filing with the court of jurisdiction to initiate a legal action to recover possession of the covered dwelling from the tenant *for nonpayment of rent* or other fees or charges; or
> (2) charge fees, penalties, or other charges to the tenant related to *such nonpayment of rent.*
> (c) NOTICE.—The lessor of a covered dwelling unit—
> (1) may not require the tenant to vacate the covered dwelling unit before the date that is 30 days after the date on which the lessor provides the tenant with a notice to vacate; *and*
> (2) may not issue a notice to vacate under paragraph (1) *until after the expiration of the period described in subsection (b).*

Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, § 4024, 134 Stat. 281, 492-94 (2020) (emphasis added).

1

The plain meaning of Section 4024's 30-day notice to vacate provision—paragraph (c)(1)—is that it applies only to evictions stemming from nonpayment of rent.[8]  Section 4024 sets forth a temporary moratorium on evictions from covered dwellings in which the basis provided for such eviction is nonpayment of rent.  Indeed, Section 4024 is titled  "Temporary Moratorium on Eviction Filings," and subsection (b) thereof explicitly sets forth a 120-day moratorium on evictions (and penalties) in covered dwellings in which the basis for initiating such an eviction (or imposing such penalties) stems from a tenant's nonpayment of rent. 134 Stat. at 493.

Subsection (c) of Section 4024, by contrast, does not explicitly set forth such a basis.  Nevertheless, by looking to "all that the Legislature has said in the

---

[8] We use the nomenclature set forth in the text of the bill which Congress enacted to describe the organizational structure of the CARES Act.

statute and related statutes which disclose legislative intent about the provision in question," we can determine whether Congress intended to supply such a basis to subsection (c) elsewhere in Section 4024. See Dep't of Ecology, 146 Wn.2d at 11. Based on the connections and cross-references placed in section 4024, it is clear that Congress intended that the basis provided in subsection (b)—nonpayment of rent—also apply to subsection (c).

Indeed, Congress plainly intended the provisions of Section 4024 to be read together. Subsection (a) sets forth the definition of the phrase "covered dwelling" and that phrase is used twice in subsection (b) and twice in subsection (c), thereby connecting these three sections. Furthermore, in subsection (c), Congress placed an "and" conjunction between paragraph (c)(1) and paragraph (c)(2), thereby connecting together the paragraphs of subsection (c). Lastly—and significantly—in paragraph (c)(2), Congress expressly referenced not only paragraph (c)(1), but also subsection (b), thereby connecting subsection (c) with subsection (b). Congress thus intertwined these three sections with not only a shared vocabulary, but also a conjunction linking together the paragraphs of subsection (c) and an express reference in subsection (c) to subsection (b). We do not consider these connections to be superfluous or meaningless. Linville, 11 Wn. App. 2d at 321 (quoting Swanson, 193 Wn. App. at 810). Therefore, it is clear that Congress intended for subsection (b), paragraph (c)(1), and paragraph (c)(2) to be connected to and read in conjunction with one another.

It follows that Congress, by implication, intended that the nonpayment of rent basis provided in subsection (b) apply to both paragraph (c)(1) and

8

paragraph (c)(2).[9]  Indeed, by extending the protections set forth in subsection (b) only to evictions stemming from nonpayment of rent, and by clearly intending that subsection (b) and (c) be read as one, Congress demonstrated its intent to extend the protections in subsection (c) only to evictions stemming from nonpayment of rent.  Thus, the plain meaning of Section 4024's 30-day notice to vacate provision is that it applies only to evictions stemming from nonpayment of rent.

2

The statutory context underlying the CARES Act also guides our interpretation of the notice to vacate provision here at issue.

As set forth above, a statute's plain meaning is derived from inquiring into "all that the Legislature has said in the statute and related statutes which disclose legislative intent about the provision in question."  Dep't of Ecology, 146 Wn.2d at 11.  "The title of a legislative act also may be referred to as a source of legislative intent."  Covell v. City of Seattle, 127 Wn.2d 874, 887-88, 905 P.2d 324 (1995) (citing Wash. Optometric Ass'n v. County of Pierce, 73 Wn.2d 445, 449, 438 P.2d 861 (1968); In re Kurtzman's Estate, 65 Wn.2d 260, 265, 396 P.2d 786 (1964)), modified on other grounds by Yim v. City of Seattle, 194 Wn.2d 682, 702, 451 P.3d 694 (2019).  In that sense, the statutory context can guide our interpretation

_____

[9] Amicus King County Bar Association Housing Justice Project suggests that the interpretation provided herein would constitute an improper addition of language to Section 4024 that Congress did not intend.  We disagree.  By connecting the provisions of Section 4024 to one another, it was plainly Congress's intent to set forth the nonpayment of rent basis in subsection (b) also in subsection (c) by implication.  Acknowledging implication is not addition.

of a provision set forth within that context.  Linville, 11 Wn. App. 2d at 321

(quoting One 1970 Chevrolet Chevelle, 166 Wn.2d at 839).

The short title of the CARES Act bill was the "Coronavirus Aid, Relief, and

*Economic Security* Act."  § 1, 134 Stat. 281 (emphasis added) (capitalization

omitted).  The Act was broken down into two divisions, Division A, "Keeping

*Workers Paid And Employed*, Health Care System Enhancements, and

*Economic Stabilization*," and Division B, "Emergency Appropriations for

Coronavirus Health Response and Agency Operations."  134 Stat. at 285

(emphasis added) (capitalization omitted).  Division A set forth six titles, "Title I—

Keeping American *Workers Paid and Employed* Act," "Title II—*Assistance* for

American *Workers*, Families, and *Businesses*," "Title III—Supporting America's

Health Care System in the Fight Against the Coronavirus," "Title IV—*Economic*

*Stabilization and Assistance* to Severely Distressed *Sectors of the United States*

*Economy*," "Title V—Coronavirus Relief *Funds*," and "Title VI—Miscellaneous

Provisions."  134 Stat. at 281-85 (emphasis added) (capitalization omitted).

Congress located the pertinent notice provision of Section 4024 in Division

A, Title IV, Subtitle A—"Coronavirus Economic Stabilization Act of 2020,"

adjacent to 28 other sections.

> **TITLE IV—*ECONOMIC STABILIZATION AND ASSISTANCE* TO**
> **SEVERELY DISTRESSED *SECTORS OF THE UNITED***
> **STATES ECONOMY**
> **Subtitle A—Coronavirus *Economic***
> ***Stabilization Act* of 2020**
> Sec. 4001. Short title. . . .
> Sec. 4002. Definitions. . . .
> Sec. 4003. Emergency relief and taxpayer protections. . . .

Sec. 4004. Limitation on certain employee compensation. . . .
Sec. 4005. Continuation of certain air service. . . .
Sec. 4006. Coordination with Secretary of Transportation. . . .
Sec. 4007. Suspension of certain aviation excise taxes. . . .
Sec. 4008. Debt guarantee authority. . . .
Sec. 4009. Temporary Government in the Sunshine Act relief. . . .
Sec. 4010. Temporary hiring flexibility. . . .
Sec. 4011. Temporary lending limit waiver. . . .
Sec. 4012. Temporary relief for community banks. . . .
Sec. 4013. Temporary relief from troubled debt restructurings. . . .
Sec. 4014. Optional temporary relief from current expected credit losses. . . .
Sec. 4015. Non-applicability of restrictions on ESF during national emergency. . . .
Sec. 4016. Temporary credit union provisions. . . .
Sec. 4017. Increasing access to materials necessary for national security and pandemic recovery. . . .
Sec. 4018. Special Inspector General for Pandemic Recovery. . . .
Sec. 4019. Conflicts of interest. . . .
Sec. 4020. Congressional Oversight Commission. . . .
Sec. 4021. Credit protection during COVID–19. . . .
Sec. 4022. Foreclosure moratorium and consumer right to request forbearance. . . .
Sec. 4023. Forbearance of residential mortgage loan payments for multifamily properties with federally backed loans. . . .
*Sec. 4024. Temporary moratorium on eviction filings.* . . .
Sec. 4025. Protection of collective bargaining agreement. . . .
Sec. 4026. Reports. . . .
Sec. 4027. Direct appropriation. . . .
Sec. 4028. Rule of construction. . . .
Sec. 4029. Termination of authority. . . .

134 Stat. at 469-97 (emphasis added) (bold face and capitalization omitted).

The statutory context of the CARES Act reflects Congress's intent to, in large part, provide economic relief and economic stabilization in response to the COVID-19 pandemic. With the exception of Title III and its emphasis on supporting the health care system, the short title of the Act, its two divisions, and the five other titles within Division A each set forth as their intended target economic stabilization, financial assistance, or relief funding. Therefore, in

11

addition to supporting the United States health care system, Congress plainly intended that the Act provide economic relief and stabilization to major sectors of the United States economy.

Turning to Title IV, within which Section 4024 is contained, Congress's economic relief and stabilization-driven purpose comes into sharper focus. Indeed, it is telling of Congress's economic intent that Section 4024 was located within Title IV, titled "Economic Stabilization and Assistance to Severely Distressed Sectors of the United States Economy," and Subtitle A, "Coronavirus Economic Stabilization Act of 2020." The same is so of those sections neighboring the temporary eviction moratorium within Subtitle A, setting forth emergency relief to taxpayers, continuing air travel service, guaranteeing certain debts, providing relief to certain banking entities, authorizing foreclosure forbearance, providing federally-backed loan mortgage payment forbearance, and protecting collective bargaining agreements. These provisions expressly regard stabilization of distressed sectors of the United States economy disrupted by the pandemic. Thus, the statutory context of not only the Act in general, but also Title IV specifically was to provide economic stabilization in response to the pandemic.

Therefore, by placing Section 4024 within Title IV, Congress plainly intended that section to be interpreted in a manner that would lead to greater economic stabilization in the relevant economic sector. The economic sector to be stabilized by Section 4024 was rental housing and the potential for the economic disruption of the pandemic to interfere with a tenant's ability to make

12

rental payments. This reinforces the interpretation that, in enacting Section 4024, Congress was concerned only with the instability created in the rental housing sector by a tenant's nonpayment of rent due to the pandemic.

3

The Amicus suggests a much broader interpretation of Section 4024, offering that, because Congress did not specify an eviction basis in the notice to vacate protections set forth in subsection (c), Congress purportedly intended that those protections be interpreted as applying to any and all notices to vacate in covered dwellings. The argument for this broad interpretation, however, is unpersuasive.

As set forth above, "we 'construe a statute so that all the language used is given effect, with no portion rendered meaningless or superfluous.'" Linville, 11 Wn. App. 2d at 321 (internal quotation marks omitted) (quoting Swanson, 193 Wn. App. at 810). Indeed, "'[c]ommon sense informs our analysis, as we avoid absurd results in statutory interpretation.'" Linville, 11 Wn. App. 2d at 321 (quoting Alvarado, 164 Wn.2d at 562). "We avoid an interpretation that results in unlikely or strained consequences." Swanson, 193 Wn. App. at 811 (citing Broughton Lumber Co. v. BNSF Ry., 174 Wn.2d 619, 635, 278 P.3d 173 (2012)).

Here, the Amicus suggests that, because subsection (c)(2) set forth a prohibition on notices to vacate during the 120-day eviction moratorium but did not expressly set forth therein a basis for eviction from which such notice could issue, Congress intended that no notices to vacate could have been provided during that moratorium. Furthermore, according to the Amicus, because

13

subsection (c)(1) required 30 days' notice for evictions but also did not expressly set forth a basis for eviction from which such notice could issue, Congress intended that, after the moratorium ended, 30 days' notice must be provided for any eviction action.

The Amicus's proposed interpretation is unpersuasive. As an initial matter, such an interpretation would render subsection (b)—the 120-day moratorium on evictions stemming from nonpayment of rent—entirely superfluous. Pursuant to such an interpretation, if no notices to vacate could issue during that moratorium, no unlawful detainer actions could be initiated. This would have the effect of entirely precluding evictions from covered dwelling units over a four-month period. If such was Congress's intent, then it would not have included subsection (b), nor limited the temporary eviction moratorium therein to evictions stemming from nonpayment of rent. To read such a broad intent into subsection (c) would thus render subsection (b) superfluous.

In addition, unlikely circumstances would result from the eviction actions prohibited by such a broad interpretation. Starting with paragraph (c)(2)—prohibiting the issuance of notices to vacate during the 120-day moratorium—the Amicus's interpretation would result in a far-reaching ban on a range of evictions that Congress likely would not have intended. Indeed, applying such an interpretation to eviction actions in Washington State, landlords would not have been permitted to issue a notice to vacate in response to circumstances such as a tenant's substantial breach of a rental agreement or a landlord's desire to sell the unit or, in more extraordinary circumstances, a tenant's criminal conduct or

14

nuisance behavior on the premises, a unit having become uninhabitable or condemned, or a tenant having engaged in unwanted sexual advances or other acts of sexual harassment toward the property owner or another tenant based on such individual's race, gender, or other protected status. See, e.g., RCW 59.18.650(2)(a)-(p). It appears to us unlikely that Congress would have intended to leave landlords helpless to evict those living in uninhabitable covered dwellings for a period of four months or to condemn tenants to live for such a period of time alongside those who engage in the listed antisocial activity. Thus, the unlikely circumstances that might result from the Amicus's broad interpretation suggest that such an interpretation was not intended by Congress.

Similarly, such an interpretation cannot plausibly be extended to a permanent 30-day notice requirement for all covered dwelling evictions from subsection (c)(1). Indeed, it is difficult to imagine Congress requiring a landlord—or neighboring tenants—to wait 30 days for the eviction of a tenant engaging in criminal activity or nuisance on the premises. Thus, a broad interpretation that Congress intended that the notice protections of subsection (c) apply to notices to vacate for any eviction would cause subsection (b) to be superfluous and would lead to absurd and unlikely circumstances. Accordingly, the Amicus's alternate interpretation cannot reflect the intention of Congress.

C

The Housing Authority asserts that the decisional authority from jurisdictions outside of Washington that have addressed this issue have uniformly adopted the interpretation presented herein. The Housing Authority is correct.

15

In a Connecticut superior court case, <u>W. Haven Hous. Auth. v. Armstrong</u>, Superior Court, Judicial District of New Haven, 2021 WL 2775095, the judge therein concluded that the CARES Act did not require a housing authority to provide 30 days' notice to vacate to evict Armstrong when the eviction action stemmed from her serious nuisance on the premises.[10] <u>Armstrong</u>, at *3. The judge reasoned that

> the language of the Act is clear. Section 4024(b) expressly provides a moratorium related to residential summary process actions commenced on the basis of nonpayment of rent. Subsection (c) of the same section, 4024 describes the requirements for the notice to vacate and expressly refers back to subsection (b). Specifically, this subsection (c), upon which the defendant relies; expressly states that the lessor of the covered dwelling unit must provide 30 days' notice "and" may not issue said notice "until after the expiration of the period described in subsection (b)."
>
> The plain language of the Act provides that the two subsections are integrally related, and the notice at issue is one for nonpayment of rent. The word "and" is conjunctive. "The word 'or' can never be substituted for 'and' in a statute when the meaning of the language used in the statute is plain and there is nothing in it to call for the substitution. Courts will construe 'or' as 'and,' and vice versa, only where from the context of other provisions of the statute, or from former laws relating to the same subject and indicating the policy of the State thereon, such clearly appears to have been the legislative intent. 25 R.C.L., <u>Statutes</u>, § 226, p. 977; <u>Sutherland, Statutory Construction</u> (1943, 3rd ed.), § 4923, p. 450." <u>Macri v. Liquor Control Commission</u>, 113 Conn. Sup. 206, 208 (1945).
>
> In reading the language of the Act as a whole, the plain and unambiguous language supports that the 30-day notice requirement is applicable to nonpayment of rent cases only and not to cases such as this one brought for serious nuisance. . . . While the defendant notes that there are no Connecticut state or federal cases that have addressed this issue in other than nonpayment of rent cases, there is good reason for that; specifically because those are indeed the cases to which these sections apply.

---

[10] We cite to this decision pursuant to GR 14.1(b), in light of Connecticut's repeal of Connecticut Superior Court Rule 5-9, which had previously prohibited citation to opinions not officially published in Connecticut.

Armstrong, at *3.

Similarly, in Watson v. Vici Community Development Corp., No. 20-1011, 2022 WL 910155 (W.D. Okla. Mar. 28, 2022) (unpublished), the federal district court judge therein implicitly concluded that Section 4024's 30-day notice to vacate paragraph applied only to notices to vacate for nonpayment of rent.[11] Watson, at *10.  There, the parties did not dispute that the development corporation landlord had not provided 30 days' notice to Watson prior to initiating the eviction action.  However, they did dispute whether the corporation's basis for eviction was the absence of a valid lease agreement or Watson's nonpayment of rent.  Watson, at *10.  The federal district court judge denied summary judgment to the corporation, finding that a genuine issue of material fact existed for trial as to the basis of the eviction therein.  Watson, at *10.  By so finding, the district court judge implicitly determined that the CARES Act required 30 days' notice only for evictions stemming from nonpayment of rent.

Lastly, in CP Commercial Properties, LLC v. Sherman, 318 So.3d 445 (La. Ct. App. 2d Cir. 2021), Sherman asserted that, contrary to Section 4024 of the CARES Act, she was not provided with 30 days' notice of the corporation's eviction action, notwithstanding that the action was predicated on her lease term having ended.  318 So.3d at 446-47.  The appellate court therein rejected her argument, stating that

> [p]aragraph (c) sets forth when notice to vacate may be sent following the moratorium stated in paragraph (b). However, that

---

[11] We cite to Watson pursuant to GR 14.1(b), in reliance on 10th Cir. R. 32.1, for its persuasive value only.

> moratorium is not even applicable in this matter as it applies to "legal action to recover possession of the covered dwelling from the tenant for nonpayment of rent or other fees or charges[.]" The eviction at issue is premised upon the ending of the lease period.

Sherman, 318 So.3d at 449 (alterations in original).

Each of these cases, in analyzing the plain text of the CARES Act, either explicitly or implicitly adopted the interpretation presented herein. Thus, the sparse decisional authority in jurisdictions outside Washington further reinforce that the CARES Act only requires 30 days' notice for evictions stemming from nonpayment of rent.

D

The Amicus suggests that a report by the federal Congressional Research Service (CRS), created after Congress passed the CARES Act, is a persuasive resource that supports a broad reading of the Act's 30-day notice to vacate provision. We disagree.

We need not resort to other aids of statutory interpretation if the plain meaning of the statute in question is clear. As discussed above, the plain meaning of Section 4024 of the CARES Act is clear: the 30-day notice paragraph therein applies only to notices for evictions stemming from nonpayment of rent. Nevertheless, even assuming that Section 4024 was ambiguous, the CRS report offered by the Amicus is unpersuasive.

The CRS report in question was issued the month following the enactment of the CARES Act. It reads in pertinent part as follows:

> CARES Act Section 4024(b) prohibits landlords of certain rental "covered dwellings" from initiating eviction proceedings or "charg[ing] fees, penalties, or other charges" against a tenant *for*

18

*the nonpayment of rent.* These protections extend for 120 days from enactment (March 27, 2020).

Section 4024(c) requires landlords of the same properties to provide tenants at least 30 days-notice before they must vacate the property. It also bars those landlords from issuing a notice to vacate during the 120-day period. In contrast to the eviction and late fee protections of Section 4024(b), which are expressly limited to nonpayment, Section 4024(c) does not expressly tie the notice to vacate requirement to a particular cause. *Thus, Section 4024(c) arguably prohibits landlords from being able to force a tenant to vacate a covered dwelling for nonpayment or any other reason until after August 24, 2020 (i.e., 120 days after enactment, plus 30 days after notice is provided).*

Section 4024(b)'s and (c)'s protections, however, do not absolve tenants of their legal responsibilities to pay rent. Tenants who do not pay rent during the eviction grace period may still face financial and legal liabilities, including eviction, after the moratorium ends.

MAGGIE MCCARTY & DAVID H. CARPENTER, CONG. RSCH. SERV., CARES ACT EVICTION MORATORIUM (Apr. 7, 2020),

https://crsreports.congress.gov/product/pdf/IN/IN11320 [https://perma.cc/YRK4-4BE9] (some emphasis added and some alterations in original).

As an initial matter, the CRS report cannot be said to form part of Congress's intent in enacting the CARES Act. It bears repeating that such a report was created not before Congress voted on the Act but, rather, after the votes had been cast. Thus, no member of Congress voted in reliance on or in confirmation of the assertion of arguable intent contained within the report.

Furthermore, the CRS report does not express the proposition that the CARES Act *requires* 30 days' notice for all covered dwelling evictions. Indeed, it does not state or present argument or analysis that such is the correct—and only—interpretation of section 4024. Rather, it merely declares that it is arguable whether the CARES Act does as much. That an interpretation of a statute is

arguable does not signify that it is correct, accurate, or even creates ambiguity. Smith, 22 Wn. App. 2d at 507 (a statute is not ambiguous merely because of different conceivable interpretations (quoting Bennett, 166 Wn. App. at 483-84)). In the end, the report merely sets forth a postenactment interpretation of Section 4024 that an argument that *could* be made for a broader interpretation thereof. As analyzed herein, such an interpretation does not withstand closer scrutiny. Thus, the CRS report does not reflect Congress's intent, expressly endorse a broader interpretation of Section 4024, or align with text and statutory context of the CARES Act. Accordingly, the CRS report is unpersuasive.

Furthermore, if we were to consider the CRS report, we would also consider Congress's enactments in the months following the passage of the CARES Act. As discussed below, we find those enactments to be a more reliable basis for legislative intent than the CRS report.

As set forth above, in March 2020, the 116th Congress passed the CARES Act. Nine months later, in December 2020, that same Congress also passed the Consolidated Appropriations Act, 2021. Pub. L. No. 116-260, § 501, 134 Stat. 1182, 2069-79 (2020). Within that bill, Congress included a provision titled "Emergency Rental Assistance," which was contained within Title V—Banking, set forth a rental payment assistance program and, notably, expressly indicated that it was to be codified at 15 U.S.C. § 9058a. 134 Stat. at 2069.

The 116th Congress's enactment of the Emergency Rental Assistance provision would be a much better source of legislative intent than the CRS report in interpreting Section 4024 of the CARES Act. The 116th Congress indicated

that such provision was to be located at 15 U.S.C. § 9058a, immediately adjacent to 15 U.S.C. § 9058, where, in the CARES Act, that same Congress had indicated that Section 4024 was to be codified.  This is significant not only because the Emergency Rental Assistance provision set forth provisions explicitly oriented toward economic relief and stabilization—appropriating and allocating funds to be put toward rental payment assistance—but also because the members of Congress were almost all the same as those who, earlier that year, had voted on the CARES Act and Section 4024 herein.   Given that, such enactment and placement of such a provision is much more likely to reflect the 116th Congress's earlier intent with regard to Section 4024 than an equivocal writing drafted by staff members who were not elected to Congress and who did not vote on such enactments.

In January 2021, one month after the Consolidated Appropriations Act was passed, the 117th Congress commenced after an intervening general election.  This Congress passed the American Rescue Plan Act of 2021.  Pub. L. No. 117-2, § 2912, 135 Stat. 6, 51-52; § 3201, 135 Stat. at 54-58; § 3201(h), 135 Stat. at 58; § 3206, 135 Stat. at 63-67 (2021).  In that bill, Congress amended a portion of the Emergency Rental Assistance provision and set forth three additional provisions, one underneath the subtitle of "Ratepayer Protection," titled "Funding for Water Assistance Program," and the other two, underneath the subtitle of "Housing Provisions," titled "Emergency Rental Assistance," and "Homeowner Assistance Fund."  135 Stat. at 51-52, 54-58, 63-67.  The 117th

Congress indicated that those provisions were to be codified at 15 U.S.C. §§ 9058b, 9058c, 9058d. 135 Stat. at 51, 54, 63.

The enactment of the American Rescue Plan Act of 2021 by the 117th Congress is a better source of legislative intent than the CRS report. A significantly similar number of congressional members of the 117 Congress voted on both the CARES Act and the American Rescue Plan Act of 2021. Furthermore, the 117th Congress's enactment similarly indicated that those provision were to be located at 15 U.S.C. §§ 9058b, 9058c, and 9058d, immediately adjacent to 15 U.S.C. § 9058. Those provisions, like the Emergency Rental Assistance provision above, also focused on economic relief and stabilization in utilities, rental housing (again), and homeownership. Therefore, even though the 117th Congress's enactment and placement of the listed provisions are not necessarily a reliable indication of the 116th Congress's intent, such are nonetheless superior to an equivocal writing drafted by staff members who were not elected and who did not cast any votes in the enactment of the CARES Act.

Thus, these later additions support the view that not only the 116th Congress but also the 117th Congress saw the CARES Act as an economic recovery and stabilization act and *not* as a means to make a general change to all eviction actions nationwide. If we were to rely on either the CRS report or subsequent enactments for an indicia of legislative intent, we would rely on those congressional enactments, and not the equivocal staff report. In deciding this matter, however, we should not consider the equivocal CRS report nor the

subsequent legislative enactments of the 116th Congress or the 117th Congress.[12]  None of those actions took place prior to the actual vote on the CARES Act.  Thus, they could not have influenced that vote.  Moreover, as discussed herein, the plain meaning of Section 4024 is clear, and we need not resort to additional aids in statutory interpretation.

E

On January 9, 2024, Division II of this court published its opinion in Pendleton Place, LLC, v. Asentista, No. 58118-3-II, (Wash. Ct. App. Jan. 9, 2024), http://www.courts.wa.gov/opinions/pdf/581183.pdf, which concluded that the CARES Act requires 30 days' notice for *all* eviction actions in dwellings covered by the Act.  There, a housing authority had issued Asentista a series of 10-day notices to vacate stemming from three instances that, the housing authority determined, constituted a substantial breach of a material term in his rental agreement.  Asentista, slip op. at 2-3.  In reversing and remanding the matter, the Division II panel concluded that the housing authority had only provided 10 days' notice to Asentista and that, pursuant to Section 4024 of the CARES Act, he was entitled to 30 days' notice.  In so concluding, the panel relied

---

[12] The Housing Authority urges us to rely on an informal question and answer document drafted by the United States Department of Housing and Urban Development (HUD) and discussing certain provisions of the CARES Act.  HUD, CDBG EVICTION MORATORIUM Q&AS 2-3 (2020), https://www.hud.gov/sites/dfiles/CPD/documents/CDBG_Eviction_Moratorium_QAs_2020_05_18_FINAL.pdf [https://perma.cc/AL3V-N6GN]  That document was created after the CARES Act was enacted.

We do not give this informal document substantial deference.  There is no indication that such document was created through a formal process.  Furthermore, other than being consistent with the plain meaning analysis above and drafted by an entity with a special expertise in the matter herein, it is not significantly persuasive.

on our decision in <u>Pinzon</u> and the CRS report, discussed <u>supra</u>.  <u>Asentista</u>, slip op. at 6-10.

For the reasons previously stated herein, we respectfully disagree with Division II's reasoning and decision in <u>Asentista</u>.

F

Section 4024 of the CARES Act requires 30 days' notice only for evictions stemming from nonpayment of rent.  Congress clearly intended that the subsections of Section 4024 be interpreted as one, and when read as such, such is the unambiguous plain meaning that follows.  The economic context of the CARES Act's other provisions and persuasive decisional authority from other jurisdictions reinforce that interpretation.  Adopting the alternative interpretation offered by the Amicus—that in the throes of the onset of a pandemic Congress initiated an expansive and permanent nationwide program of landlord and tenant eviction reform—would lead to unlikely and absurd results in rental housing.

Thus, the plain meaning of the CARES Act is that it requires 30 days' notice to vacate only for evictions stemming from nonpayment of rent.  Accordingly, the superior court commissioner erred by denying the Housing Authority's petition and dismissing its unlawful detainer action against the Knights.

IV

As a final matter, we recognize that the Knights, to our knowledge, have not received actual notice of this appeal.  They did not submit any filings to the

superior court, appear in the proceedings therein, submit any filings to this court, or otherwise participate at any stage in this matter.

It is undisputed that both the Housing Authority and this court sent notices to the Knights at their last known address, the rental unit from which the Housing Authority was seeking to evict them. However, it is unclear if the Knights actually received such notice.[13]

Nevertheless, it is well-established that the test for due process is not whether actual notice is received, but whether the notice was sent in a manner "reasonably calculated to reach the intended parties." In re Saltis, 25 Wn. App. 214, 219, 607 P.2d 316 (1980) (citing Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 318, 70 S. Ct. 652, 94 L. Ed. 865 (1950) ("within the limits of practicability notice must be such as is reasonably calculated to reach interested parties"); State v. Wenof, 102 N.J. Super. 370, 246 A.2d 59 (1968)), aff'd, 94 Wn.2d 889, 621 P.2d 716 (1980). Our Rules of Appellate Procedure set forth that sending notice by mail to a party's last known address may, in certain situations, satisfy this requirement. See RAP 18.5(a) (citing CR 5(b), (f), (g)); see also In re Saltis, 25 Wn. App. at 219.

The record supports that the notice herein was sent in a manner reasonably calculated to reach the Knights. The Knights' last known address

---

[13] The record contains a declaration from a representative of the Housing Authority stating that she affixed a copy of the notice to vacate on the door of that rental unit and later, while at that unit, she personally delivered to Angela Knight a packet of legal documents pertaining to the superior court proceedings. The record also contains a declaration from an employee of the Housing Authority's legal counsel stating that he mailed a copy of the notice of appeal addressed to the rental unit in question. Our court staff also mailed letters, orders, and rulings pertaining to this appeal to that address, but they were returned as undelivered.

was the rental unit in question, and notice by the Housing Authority and by this court was mailed to that address. Thus, although the absence of actual notice gives us concern about the Knights' due process rights, the notice provided herein appears to have satisfied due process.

The Knights may yet have rights or remedies available to them, including the vacation of a mandate or vacation of judgment entered upon a vacated mandate.[14] Nonetheless, with the understanding that we do not have clear answers to those questions, we reverse and remand this matter to the superior court for the reasons discussed herein.[15, 16]

Reversed and remanded.

Dwyer, J.

---

[14] No evidence in the record suggests that the Housing Authority's representations regarding service of process are inaccurate. However, if the Knights can sustain an assertion of prejudice arising therefrom, then the Knights "may move in the appellate court for appropriate relief." RAP 5.4(b). In such a scenario, it is unclear what rights the Knights might retain, whether our appellate mandate would be effective, how much time they might have to challenge such a mandate, and whether a superior court could enter effective monetary judgment against them.

[15] We do not award sanctions or appellate costs. In reversing and remanding this matter, we leave it to the serenity of the superior court as to whether it wishes to do so on remand, should any such request be made.

[16] We recognize that our decision today conflicts with the earlier Division II opinion discussed herein. We also recognize that, as the prevailing party, the Housing Authority has no motivation to seek review by our Supreme Court. Similarly, as the Knights have not appeared, they will most assuredly not be the source of a petition for review. And, finally, Amicus is not a party and thus is not an "aggrieved party." This issue may escape further review, notwithstanding its eligibility for such review. See RAP 13.3(a)(1), 13.4(a), (b)(2).

WE CONCUR:

Díaz, J.

Smith, C.J.